**ANTHEM ELECTRONICS, INC., Plaintiff–Appellant,**

v.

**PACIFIC EMPLOYERS INSURANCE COMPANY, a California corporation; Federal Insurance Company, an Indiana corporation, Defendants–Appellees.**

No. 01–16402.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 2002.

Filed Sept. 5, 2002.

David A. Gauntlett, James A. Lowe, Gauntlett & Assoc., Irvine, CA, for the plaintiff-appellant.

Stephen L. Newton, O. Antony Abdollahi, Newton, Kastner & Remmel, Mountain View, CA, for defendant-appellee Federal Insurance Co.

Robert B. Stringer, Cyril & Crowley LLP, San Francisco, CA, for defendant-appellee Pacific Employers Insurance Co.

Before SCHROEDER, Chief Judge, D.W. NELSON and REINHARDT, Circuit Judges.

**OPINION**

D.W. NELSON, Circuit Judge.

We are asked to decide whether, under California law, the plaintiff's general liability insurance policies required the defendants, two insurance companies, to defend their insured against a negligence and breach of contract suit brought by a third party. The district court granted summary judgment to the insurers. Because the complaint at issue clearly raised the possibility that the claims against the insured would be covered under the insurance policies, we reverse, grant partial summary judgment to the plaintiff, and remand.

## I. Background

In April 1991, plaintiff and appellant Anthem Electronics agreed to supply circuit boards to KLA Instruments Corp., a manufacturer, to be incorporated into scanners that KLA then sold.[1] KLA took delivery of Anthem circuit boards from about August 1991 through November 1992.

Both the circuit boards supplied by Anthem and KLA's final scanner products were quality tested before they were shipped to customers. Despite this, the circuit boards had latent defects that caused some of the scanners to fail once in use. The circuit boards supplied by Anthem, it turns out, were physically defective such that heat, physical vibration or electrical current over time could cause the electrical connections on the circuit boards to crack or lift apart, causing electrical "opens" that prevented the scanners from working. Anthem admits that these defects were due to manufacturing flaws (though it blames its own subcontractor for these flaws).

Because some of the scanners in use by KLA's customers failed, KLA was forced to replace them and to incur other unexpected costs due to the loss of use of the scanners into which Anthem's circuit boards had been installed. To recoup these costs, KLA sued Anthem in state court. The complaint, filed in November 1994, states causes of action against Anthem for breach of contract, negligence, breach of express warranty, breach of implied warranty of fitness, breach of implied warranty of merchantability, negligent misrepresentation, *indebitatus assumpsit,* and constructive trust. It alleges that the circuit boards supplied by Anthem were defective; that KLA installed these boards into KLA products; that the boards intermittently failed; and that, as a result of the defective boards, KLA suffered damages exceeding $4.5 million.

In answer to interrogatories, KLA categorized its damages claim as including, among other expenses, the following:

- Approximately $2.2 million in depreciation expenses for "loaner" scanners placed at 14 customer sites while defective KLA scanners were under repair
- Approximately $0.5 million in interest expenses (inventory cost) for scanners rendered unshippable by the defective Anthem components
- Approximately $0.7 million in lost interest revenue as a result of customers' failures to pay bills on time because of defective scanners

Anthem tendered KLA's complaint to its two general liability coverage insurers, Pacific Employers Insurance Co. ("Pacific") and Federal Insurance Co. ("Federal") (collectively, "the insurers"), and requested that the insurers defend Anthem against

---

1. The parties also occasionally refer to the products sold to KLA by Anthem as "SMT assemblies." We use the term "circuit boards" to refer to these products and intend it to be synonymous with SMT assemblies.

the KLA suit. The insurers refused, arguing that the losses alleged in KLA's complaint were not covered under their insurance policies.

The two insurance policies at issue are both commercial general liability ("CGL") policies. Pacific's policy covered Anthem from June 1, 1991, through June 1, 1992. Federal's CGL policy covered Anthem from June 1, 1992, through June 1, 1994. The two are nearly identical in all relevant aspects, and both are based on standard forms used nationally. Thus, we will detail the Federal policy and will discuss the Pacific policy separately only when a difference so requires.

The Federal policy provides that:

We [Federal] will pay damages the insured becomes legally obligated to pay ... because of ... property damage caused by an occurrence ... to which this insurance applies.

* * *

This insurance applies ... to property damage which occurs during the policy period....

The policy defines "property damage" as: "Physical injury to tangible property, including ... loss of use of tangible property that is not physically injured." An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions which result in bodily injury or property damage." Thus, the policy covers damages Anthem is required to pay to third parties because of loss of use of tangible property due to an occurrence. The policy also gives Federal the duty to defend Anthem against any suit seeking covered damages.

Lastly, the policy contains an "impaired property exclusion" which excludes coverage for:

Property damage to impaired property or property that has not been physically injured arising out of: (1) defect, deficiency, inadequacy or dangerous condition in [Anthem's] product or [Anthem's] work; or (2) A delay or failure by [Anthem] or anyone acting on [its] behalf to perform a contract in accordance with its terms. BUT this exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to [Anthem's] product or [Anthem's] work after it has been put to its intended use.

After the insurers refused to defend Anthem against KLA's suit, Anthem undertook its own defense and eventually settled with KLA. Anthem then filed the current action against the insurers for breach of contract, seeking attorney's fees, reimbursement for the settlement, and declaratory relief. The district court issued a judgment on the pleadings for the insurers, which was reversed by this court.

 Anthem then filed a motion for partial summary judgment against the insurers on the "duty to defend" question, that is, whether the insurers were required to defend Anthem against the KLA suit.[2] Federal filed a cross motion for summary judgment against Anthem on this question, which Pacific later joined. On March 28, 2001, the district court denied Anthem's motion for partial summary judgment and granted the insurers' motion for summary judgment. The district court based its ruling on two grounds: (1) the failures of the SMT assemblies were not "occur-

---

2. As discussed *infra* at page 13188, an insurer's duty to defend is broader than its duty to indemnify, so that insurers are sometimes required to defend their insureds even in situations in which the loss is not ultimately cov-

ered. Because the duty to defend is broader than the duty to indemnify, summary judgment for the insurers on the former necessarily includes the latter. Only the insurers' duty to defend is at issue in this appeal.

rences" under the policies, and (2) even if the failures were occurrences, the policies' impaired property exclusion barred coverage.

We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* the district court's grant of summary judgment. *Lopez·v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000). We must determine, viewing the evidence in the light most favorable to Anthem, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

II. Discussion

The insurance policies at issue are so-called "third party liability policies," that is, policies that provide coverage for liability of the insured to third parties. Such policies provide broader coverage than typical first party property insurance policies, such as homeowners' policies, in which the insurer "promises to pay money to the insured upon the happening of an event, the risk of which has been insured against." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 663, 42 Cal. Rptr.2d 324, 913 P.2d 878 (1995). In third party liability policies, by contrast, the carrier "assumes a contractual duty to pay judgments the insured becomes legally obligated to pay as damages because of bodily injury or property damage caused by the insured." *Id.*

Whereas first party insurance coverage is typically triggered by certain enumerated perils, e.g., physical and fortuitous events, the "right to coverage in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty.... [B]y insuring for personal liability, and agreeing to cover the insured for his own negligence, the insurer agrees to cover the insured for a broader spectrum of risks [than in first-party insurance policies]." *Id.* at 664, 42 Cal.

Rptr.2d 324, 913 P.2d 878 (emphasis omitted).

An insurer has a very broad duty to defend its insured under California law. The California Supreme Court has stated that "the insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy." *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993). "[O]nce the insured has established potential liability by reference to the factual allegations of the complaint, the terms of the policy, and any extrinsic evidence upon which the insured intends to rely, the insurer must assume its duty to defend unless and until it can *conclusively* refute that potential." *Id.* (emphasis added). To protect an insured's right to call on the insurer's "superior resources for the defense of third party claims ... California courts have been consistently solicitous of insureds' expectations on this score." *Id.* at 295–96, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor. *Id.* at 299–300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.

The determination whether the insurer owes a duty to defend is usually made in the first instance by comparing the allegations of the complaint with the terms of the policy. *See id.* at 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. *Id.* Furthermore, an insurer must undertake a reasonable investigation into the circumstances of the claim before denying coverage. *Am. Int'l Bank v. Fideli-*

*ty and Deposit Co.,* 49 Cal.App.4th 1558, 1571, 57 Cal.Rptr.2d 567 (1996).

■ Against this backdrop, Anthem's case centers on whether, under its CGL policies, (A) the failure of Anthem's circuit boards due to faulty workmanship qualifies as an "occurrence"; (B) the loss of use of KLA's scanners due to the failure of Anthem's circuit boards qualifies as "property damage"; and (C) the impaired property exclusion applies to exclude coverage. Once Anthem establishes that the damages sought in the KLA suit are potentially covered under the policies (sometimes referred to as making a *prima facie* showing), the insurers must conclusively establish the absence of *any potential* for coverage in order to prevail on the duty-to-defend issue. *Id.* at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Thus, to support the district court's summary judgment in their favor, the insurers must show that there is no genuine issue of material fact as to the potential for coverage. *Id.*

### A. Did the KLA complaint and/or extrinsic facts establish the possibility of a covered "occurrence"?

■ Anthem argues that the failures of the circuit boards were "occurrences" within the meaning of the policies. An "occurrence" is defined in the Federal policy to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions which result in bodily injury or property damage." Similarly, the Pacific policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In both definitions, the operative word is *accident.*

Reviewing the KLA complaint and comparing it to the terms of the policies, we conclude that the complaint establishes the possibility of a covered "occurrence" for which Anthem may be liable. This is be-cause, at bottom, an occurrence is simply an unexpected consequence of an insured's act, even if due to negligence or faulty work. The breakage and failures of the circuit boards were unintended consequences of Anthem's production and sale of the boards.

■ In the third-party liability insurance context, accidents need not crash or clatter; they need only be unexpected consequences, and they may result even from the insured's own negligence. Dealing with the same definition of "occurrence" in a CGL insurance policy, the California Court of Appeal has defined "accidental" to include unexpected happenings that occur through carelessness. *Am. Int'l Bank,* 49 Cal.App.4th at 1573, 57 Cal.Rptr.2d 567; *see also Hogan v. Midland Nat. Ins. Co.,* 3 Cal.3d 553, 559, 91 Cal.Rptr. 153, 476 P.2d 825 (1970). Put another way, "[w]hen the injury [or property damage] is an unexpected or unintended consequence of the insured's conduct, it may be characterized as an accident for which coverage exists." *Chu v. Canadian Indem. Co.,* 224 Cal. App.3d 86, 96, 274 Cal.Rptr. 20 (1990).

Thus, California courts construing similar CGL policies have found coverage where the insured was negligent, and in particular where the insured had installed or supplied defective products, so long as the insured did not know it was doing so. *See Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.,* 51 Cal.2d 558, 563–64, 334 P.2d 881 (1959) (a classic case in which the California Supreme Court held that the failures of doors, which had been installed with latent defects and which caused property damage, were "accidents" covered by the policy); *Hogan,* 3 Cal.3d at 559–60, 91 Cal.Rptr. 153, 476 P.2d 825 (holding that damage to timber boards resulting from a defective saw supplied by the insured was an "accident"); *Maryland Cas. Co. v. Nat'l Am. Ins. Co.,*

48 Cal.App.4th 1822, 1831, 56 Cal.Rptr.2d 498 (1996) (holding that a complaint filed against an insured contractor alleging defective construction work that caused damage establishes a *prima facie* case of coverage for the contractor).

Here, the circuit boards supplied by Anthem unexpectedly failed. This failure, even if the result of Anthem's negligence, raises the possibility of a covered occurrence because it may have "happen[ed] without intent or through carelessness." *Am. Int'l Bank*, 49 Cal.App.4th at 1573, 57 Cal.Rptr.2d 567. Furthermore, the KLA complaint sufficed to inform the insurers that this was so. The insurers knew from the complaint that Anthem's products had defects, that these products were installed into KLA systems, and that the products failed. Though the complaint said nothing affirmative about the defects being accidental, neither did it provide a reason to think that they were expected. The possibility that the defects were unexpected is enough to trigger the insurers' duty to defend even though the complaint failed to allege an accident. *See Montrose*, 6 Cal.4th at 304, 24 Cal.Rptr.2d 467, 861 P.2d 1153(affirming summary judgment for the insured because the allegations in the complaint "sufficed to raise the possibility" that the insured would be liable for negligent disposal, even though the complaint failed to allege negligence).

■ The insurers have a heavy burden when seeking summary judgment on the duty to defend. As noted, an insurer must defend its insured so long as the complaint at issue *raises the possibility* that the insured will be liable for losses covered by its policy. *Id.* at 304, 24 Cal.Rptr.2d 467, 861 P.2d 1153; *Maryland Cas. Co.*, 48 Cal.App.4th at 1831, 56 Cal.Rptr.2d 498. Put starkly by the California Supreme Court, the insurers here are relieved of their duty to defend only if KLA's complaint "*can by no conceivable theory raise*

*a single issue which could bring it within the policy coverage.*" *Montrose*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (quoting *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275 n. 15, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)). The insurers fail to meet this burden here.

In the main, the insurers counter with two arguments. First, they argue against an occurrence where, as here, a supplier simply breaches a contract and supplies defective goods. But this argument seeks to revive a wooden distinction recently rejected by the California Supreme Court between contractual claims and insurance claims. *See Vandenberg v. Superior Court*, 21 Cal.4th 815, 840, 88 Cal.Rptr.2d 366, 982 P.2d 229 (1999) (holding that courts must focus on the nature of the risk and the injury, in light of policy provisions, to determine coverage—not on whether the insured breached a contract). So long as Anthem can show that the circuit boards failed unexpectedly and caused covered property damage, it is well on its way to a *prima facie* case even though a breach of contract may be involved. *See id.; cf. Stein–Brief Group, Inc. v. Home Indem. Co.*, 65 Cal.App.4th 364, 76 Cal.Rptr.2d 3 (1998) (dealing only with the breach of a real estate contract, not with the supply of defective goods that later fail unexpectedly).

Second, the insurers argue that the so-called "economic loss rule" precludes an occurrence here. The cases they rely on, however, simply reiterate that tangible property, as opposed to purely economic interests, must be affected to meet the CGL definition of "property damage." *See, e.g., Waller v. Truck Ins. Exchange Inc.*, 11 Cal.4th 1, 26–27, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) ("CGL policies do not provide coverage for intangible property losses, including economic losses"). Here tangible property, in the form of the

KLA scanners, was damaged within the meaning of the policies through loss of use. We decline to hold that coverage is precluded simply because the extent of such damage is expressed as an economic loss. *See Hogan,* 3 Cal.3d at 562–563, 91 Cal. Rptr. 153, 476 P.2d 825.

### B. Did the KLA complaint and/or extrinsic facts establish the possibility of covered "property damage"?

■ Under the policy terms, the insurers owe coverage (and the duty to defend) only if covered "occurrences" proximately caused "property damage." Property damage is defined in both policies to include the loss of use of tangible property, even if that property is not itself physically injured. Anthem argues that this definition is met because the circuit boards' unexpected failures caused the loss of use of other property, namely, the scanners into which they had been installed. We agree.

Anthem's defective boards clearly caused "property damage" to other property, as that term is defined in the policies. KLA's customers lost the use of tangible property (their scanners), and as a result KLA suffered losses due to loaner scanners and diminished receivables. KLA itself lost the use of unshippable scanners sitting in inventory, and as a result incurred unexpected inventory costs. Though Anthem's boards were damaged, other parts of the scanners were not. This property damage meets the definition of "loss of use of tangible property that is not physically injured." *See Hendrickson v. Zurich Am. Ins. Co.,* 72 Cal.App.4th 1084, 1091–92, 85 Cal.Rptr.2d 622 (1999) (holding, where an insured strawberry plant supplier sold defective plants, that the supplier was covered for liability stemming from the lost use of the land on which the plants were grown, unproductively); *see also Travelers Ins. Co. v. Penda Corp.,* 974 F.2d 823, 832–833 (7th Cir.1992) (holding, where an insured supplied defective pages for incorporation into a larger book, that the insured was covered for liability stemming from the lost use of the entire book, while pages were replaced).

Providing coverage for the loss of use of a larger product into which an insured's parts are incorporated comports with the rationale laid out by the California Court of Appeal in describing the traditional exclusion for the costs of repairing inferior work. The court explained:

> General liability policies, such as the ones in dispute here, are not designed to provide contractors and developers with coverage against claims their work is inferior or defective. The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer. Rather liability coverage comes into play when the insured's defective materials or work *cause injury to property other than the insured's own work or products.* As one commentator explained: "This distinction is significant. Replacement and repair costs are to some degree within the control of the insured. They can be minimized by careful purchasing, inspection of material, quality control and hiring policies.... Replacement and repair losses tend to be more frequent than losses through injury to other property, but replacement and repair losses are limited in amount since *the greatest loss cannot exceed the cost of total replacement.*"

*Maryland Cas. Co. v. Reeder,* 221 Cal. App.3d 961, 967, 270 Cal.Rptr. 719 (1990) (quoting Macaulay, *Justice Traynor and the Law of Contracts,* 13 Stan. L. Rev. 812, 825-26 (1961)) (internal citations and quotations omitted, and emphasis added). While the risk of replacing and repairing one's own product is capped at the total

replacement cost, the risk of loss of use of the larger system into which one's product is incorporated is not so limited. The loss could, in fact, be disproportionately large (if, for instance, a relatively cheap component part is installed into an expensive device, or into a device involved in valuable manufacture, for which loss-of-use damages may far outrun replacement costs). It is the risk of a loss worth more than the price of the component itself, i.e. to *other* property, against which these CGL policies mitigate.

The insurers protest by repeatedly insisting that there should be "no coverage for inferior workmanship." But Anthem's retort is correct: The cases cited by insurers for this proposition do not involve damages to, or lost use of, property other than the insured's own product. For instance, the *Maryland Casualty* court concedes that even though "inferior materials or workmanship" do not constitute property damage, "where the defect in fact has caused ... the lost use of tangible property, liability coverage has been found." *Maryland Cas.*, 221 Cal.App.3d at 969–70, 270 Cal.Rptr. 719. Ours is just such a case: The defect to the circuit boards caused the lost use of tangible property, namely, the KLA scanners.

The insurers also argue that the underlying complaint, along with extrinsic facts, did not suggest *at the time of tender* that any KLA losses might be covered under the policies. Again, we are mindful of the insurers' burden here: They are relieved of their duty to defend if KLA's complaint "can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Montrose*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (quoting *Gray*, 65 Cal.2d at 275 n. 15, 54 Cal.Rptr. 104, 419 P.2d 168).

Thus, in *Hendrickson*, an insured strawberry plant seller sold a farmer defective plants that the farmer planted in his fields, but that did not yield the expected crop. The farmer sued the plant seller, and the plant seller tendered the complaint to its insurer, which refused defense. The California Court of Appeal reversed a lower court's summary judgment in favor of the insurer on the duty to defend. *See Hendrickson*, 72 Cal.App.4th at 1092–93, 85 Cal.Rptr.2d 622. The insurance policy at issue in that case, like those here, insured the plant seller against damages it incurred to third parties for loss of use of property. In the view of the Court of Appeal, the complaint filed by the farmer against the plant seller could "reasonably be construed as alleging that ... the growers suffered a loss of strawberry production, and thereby a loss of the use of their land," due to the supply of defective plants. *Id.* at 1092, 85 Cal.Rptr.2d 622. The Court of Appeal came to this conclusion even though the farmer's complaint did not mention loss of use of land.

Here, as in *Hendrickson*, the KLA complaint was sufficient to raise the possibility that KLA suffered a loss of use of the systems into which Anthem's circuit boards had been installed. The insurers knew from the complaint that Anthem's products had defects, that these products were installed into KLA systems, and that the products failed. The complaint raises an obvious inference that KLA lost the use of its systems because of Anthem's defective products. It is far from true that the KLA complaint "can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Montrose*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153. The complaint therefore sufficed to raise the possibility that Anthem would be subject to damages for a covered occurrence and covered property damage.

*C. Does the impaired property exclusion bar coverage?*

 To make out its *prima facie* case for coverage, Anthem must further show

that the policies' impaired property exclusion may not apply. This clause excludes coverage for property damage arising out of a defect in Anthem's work or a failure by Anthem to perform a contract as required. Anthem has admitted that the exclusion would apply but for its exception saving coverage for some claims. The only issue to be adjudicated, therefore, is whether the exception to the exclusion rescues Anthem's claim.

As with the initial burden of showing that its claim is covered, Anthem must show only that the KLA complaint, together with any extrinsic evidence, raises a "possibility" that the exception to the exclusion applies.[3] *Cf. Id.* at 304, 24 Cal. Rptr.2d 467, 861 P.2d 1153. Once Anthem does so, to win summary judgment on their duty to defend the insurers must prove that the exception cannot apply. *Id.*

The exception requires coverage for "the loss of use of other property arising out of sudden and accidental physical injury to [Anthem's] product or [Anthem's] work after it has been put to its intended use." Anthem argues that the loss of use of the scanners arose out of the sudden and accidental physical damage to their circuit boards after they had been put to use. Because the KLA complaint, along with extrinsic evidence examined by the insurers, strongly suggested the possibility that this exception would apply, Anthem has made out a *prima facie* case for coverage.

The complaint states that the circuit boards were defective, specifying that physical defects in the boards caused their "intermittent failure." One possible reason for physical defects that cause intermittent failure is a sudden, unexpected physical injury to the circuit boards. Thus

the complaint itself likely raised the possibility of a sudden and accidental physical injury sufficient to satisfy the exception. *Cf. Id.* at 304, 24 Cal.Rptr.2d 467, 861 P.2d 1153(upholding summary judgment for the insured because the allegations in the complaint "sufficed to raise the possibility" that the insured would be covered). Again, it is far from true that the KLA complaint "can by no conceivable theory raise a single issue which could bring it within the policy coverage" by implicating the exception to the exclusion. *Id.* at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.

Moreover, in addition to the complaint, Pacific examined extrinsic evidence concerning the failures that further suggests that the exception might apply. A diagnostic report from an independent lab, Trace Laboratories, dated September 10, 1993, details the failures of the circuit boards. It states that an "interconnect separation" occurred on the boards, causing "intermittent and/or open circuits in the field." In other words, physical damage to the boards occurred after the product had been placed in use, breaking the scanners. The report detailed:

> We also observed separation in random areas between internal copper foil layers and the plated copper barrel. This condition was present only after thermal stressing.... Testing also indicates that interconnect separation has likely contributed to or caused open circuits you are experiencing.... It is common for product to pass visual and electrical screening testing, only to develop intermittent and/or open circuits in the field.

The nature of the physical damage described, separation only upon thermal

---

**3.** Federal's citation to *Aydin* to contest this burden is off point. *See Aydin Corp. v. First State Ins. Co.,* 18 Cal.4th 1183, 77 Cal.Rptr.2d 537, 959 P.2d 1213 (1998). That case equated the burden of proving an exception with the general burden of proving coverage, both of which are borne by the insured. *Id.* at 1192, 77 Cal.Rptr.2d 537, 959 P.2d 1213. Thus, in a duty-to-defend case, the insured need only raise a *prima facie* case as to both.

stressing, strongly suggests that the damage may have occurred suddenly.

We emphasize that, at the duty to defend stage, Anthem need not prove that the circuit boards failed because of a sudden and accidental physical injury. Rather, it need only show that the complaint and any extrinsic evidence raised the possibility that such was the case. This it clearly did. To negate their duty to defend, by contrast, the insurers must conclusively show that the underlying claims *cannot* fall within policy coverage. As explained by the California Supreme Court, "any seeming disparity in the respective burdens merely reflects the substantive law." *Id.* at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.

In sum, the information in front of the insurers at tender raised the possibility that an unforeseen happening for which Anthem was responsible caused the loss of use of KLA's scanners, and that this happening was caused by sudden and accidental physical damage to the circuit boards. This *prima facie* case shifted the burden to Pacific and Federal to show, conclusively, that the damages sought by KLA were not covered under the policies. The insurers fail to do so, and therefore summary judgment in their favor must be reversed.

### D. Anthem's motion for partial summary judgment

 Under clear California precedent, summary judgment for Anthem is required unless the insurers are able, at summary judgment stage, conclusively to negate coverage as a matter of law. "Once a *prima facie* showing is made that the underlying action fell within coverage provisions, an insurer may defeat a motion for summary judgment [on the duty to defend] only by producing undisputed extrinsic evidence conclusively eliminating the potential for coverage under the policy." *Maryland Cas. Co.*, 48 Cal.App.4th at 1832, 56 Cal.Rptr.2d 498. "Evidence that merely placed in dispute whether [Anthem's] actions would eventually be determined not to constitute an occurrence or to fall within one or more of the exclusions contained in the policies is insufficient to defeat the insured's right to summary judgment." *Id.* (internal quotation marks omitted) (quoting *Montrose*, 6 Cal.4th at 304, 24 Cal.Rptr.2d 467, 861 P.2d 1153).

For these reasons, the insurers' attempt to raise questions of fact about the ultimate issue of coverage (such as, e.g., whether Anthem knew that its boards were defective when it shipped them) cannot defeat summary judgment for Anthem on the duty to defend. The insurers may do so only if they "produce[ ] undisputed evidence of [knowledge] negating coverage potential as a matter of law." *Maryland Cas. Co.*, 48 Cal.App.4th at 1832, 56 Cal.Rptr.2d 498. The insurers have failed to meet this burden. We therefore grant partial summary judgment to Anthem on the duty to defend.

### III. Conclusion

For the foregoing reasons, we REVERSE the grant of summary judgment for the insurers, REVERSE the denial of summary judgment to Anthem on the duty to defend, GRANT partial summary judgment to Anthem on the duty to defend, and REMAND for proceedings consistent with this opinion.