**VICOR CORPORATION, Plaintiff,**

v.

**VIGILANT INSURANCE COMPANY, Federal Insurance Company and Continental Casualty Company, Defendants.**

**Civil Action No. 07–10517–WGY.**

United States District Court, D. Massachusetts.

March 2, 2009.

David R. Anderson, Christopher R. Carroll, Matthew J. Lodge, Carroll McNulty & Kull LLC, Basking Ridge, NJ, Nicole L. Cook, Robert P. Powers, Melick, Porter & Shea, LLP, Richard E. Heifetz, Scott J. Tucker, Tucker, Heifetz & Saltzman, LLP Boston, MA, Douglas K. Eisenstein, Carroll McNulty & Kull LLC, New York, NY, for Defendants.

Lynda R. Jensen, Peter C. Netburn, Kevin J. O'Connor, Hermes, Netburn, O'Connor & Spearing, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

Vicor Corporation ("Vicor") brought this action seeking insurance coverage for settlement payments it made to resolve claims for damages brought by its customer, Ericsson Wireless Communications ("Ericsson"), under primary and excess level insurance policies issued by Vigilant Insurance Company ("Vigilant"), Federal Insurance Company ("Federal"), and Continental Casualty Company ("Continental") (collectively "the insurers"). Complaint ("Compl.") [Doc. 1].

Vicor manufactures electronic components known as power converters. Vicor sold power converters to Ericsson, and Ericsson incorporated the power converters into electronic equipment used in wireless communications systems known as radio base stations, which Ericsson designed, manufactured, and sold. The radio base stations were part of the equipment that was used to set up and operate cellular telephone towers and the associated communication networks. Ericsson sold its products to wireless providers worldwide. Ericsson's customers included Cricket Communications ("Cricket"), which operated in North America, and China Unicom, which operated in provinces of China.

In October 2003, a number of Ericsson's customers, including Cricket and China Unicom, suffered large scale service interruptions when some of Ericsson's radio base stations suddenly failed to operate. Ericsson attributed the failures of its products to multiple failures of the Vicor power converters. In May 2004, Ericsson filed a lawsuit against Vicor. In March 2007, Ericsson and Vicor settled the Ericsson litigation for $50,000,000. Vigilant and Federal contributed approximately $13,000,000 to the settlement based upon insurance coverage other than the coverage for "loss of use" damages. Vicor funded the remaining $37,000,000 of the settlement. Vicor then brought this action against Vigilant, Federal and Continental to recover the $37,000,000 that it contributed towards the Ericsson settlement. Vicor claims its contribution constitutes covered "loss of use" damages.

This matter was tried to a jury over eight days. The insurers moved for a directed verdict at the close of the evidence and the Court denied the motion. Electronic Clerk's Notes, November 13, 2008. On November 14, 2008, the jury returned a verdict for Vicor against the insurers and awarded damages of $17,300,000. [Doc. 131]. Specifically, the

jury found for Vicor and assessed "loss of use" damages of $8,000,000 for the period October 1, 2002, through September 30, 2003, and $9,300,000 for the period October 1, 2003, through September 30, 2004. *Id.* All parties agree—and this is important— that the $17,300,000 jury award is made up of: $8,000,000 covering the Ericsson–Cricket settlement; $3,300,000 covering emergency equipment provided to China Unicom; and $6,000,000 covering emergency response costs to restore customer networks.[1] Vigilant and Federal filed a motion for judgment as matter of law or, alternatively, a new trial [Doc. 134] and a motion for a new trial [Doc. 135]. Continental filed a motion for judgment as matter of law [Doc. 144].

The principal issue at trial was whether the $37,000,000 paid by Vicor to settle the Ericsson litigation was for "loss of use" damages covered under the terms of the respective insurance policies. The insurance policies provided coverage for "loss of use of tangible property that is not physically injured." Vicor's burden at trial was to establish, by a preponderance of the evidence, that the $37,000,000 it contributed to the Ericsson settlement, or a portion thereof, was for covered "loss of use" damages.

The phrase "loss of use" standing alone is not particularly instructive. All parties turn to well-developed California jurisprudence as a persuasive guide. One measure of "loss of use" damages is lost rental value or its equivalent. *Collin v. American Empire Ins. Co.*, 21 Cal.App.4th 787, 26 Cal.Rptr.2d 391, 408–09 (1994) (holding "loss of use" damage for a stolen car is rental value of a substitute car). "Loss of use" damages are not, however, limited to lost rental value or its equivalent. *Atmel*

*Corp. v. St. Paul Fire & Marine Ins. Co.*, 430 F.Supp.2d 989, 994 (N.D.Cal.2006). In *Atmel*, the court rejected the contention that "loss of use" damages only consist of rental value or its equivalent. *Id.* The court similarly rejected an expansive definition of "loss of use" damages that included "any and all damages related to the failure of the product." *Id.* Specifically, the court held that costs associated with repairing and replacing the product were not covered "loss of use" damages. *Id.* Instead, the court held that covered "loss of use" damages require a "nexus with … the inability to use [the product,] … a more direct connection between the damages claimed and the loss of use of the property …" *Id.* at 994–95.

In *Anthem Elec., Inc. v. Pacific Employers Ins. Co.*, 302 F.3d 1049 (9th Cir. 2002), the court considered, *inter alia*, whether claimed damages were covered under an insurance policy providing coverage for "loss of use of tangible property that is not physically injured." *Id.* at 1053. In *Anthem*, Anthem supplied circuit boards to KLA, a manufacturer, to be incorporated into scanners that KLA then sold. *Id.* at 1052. The circuit boards had latent defects that caused some of the scanners to fail once in use. *Id.* KLA's claimed damages included $2,200,000 for "loaner" scanners placed at customer sites while defective KLA scanners were under repair. *Id.* The *Anthem* court held that while the risk of replacing and repairing defective materials was a commercial risk that is not passed on to the insurer, KLA's losses due to the loaner scanners were "loss of use" damages under the terms of the insurance policy. *Id.* at 1057.

---

1. The insurers factually contested the "emergency" nature of these damages. The Court properly instructed the jury that emergency response costs constituted "loss of use" damages.

Armed with this authority, the Court instructed the jury on "loss of use" damages. In doing so, the Court provided the following example:

In car insurance, if you have loss-of-use damages and you get into an accident and your car's towed away, the loss-of-use damages cover renting another car so you can get on the road and have the benefit of a car and go to work and where you want to go with your car. They do not cover repairing your car.

Trial Tr., 97:5–10, November 13, 2008. The Court then provided further instruction with respect to the specific issues at trial:

Loss-of-use damages is covered. And that would cover these emergency response costs if they include repairs, if those were the emergency repairs and everyone's saying let's get the system up and running. That's covered . . . And if the Ericsson/Cricket settlement, if that paid Cricket for emergency response costs, then that's something that Ericsson incurred and they can charge that back against Vicor . . .

*Id.* at 99:2–100:7.

In addition, the Court instructed the jury on damages not covered as "loss of use" damages. In doing so, the Court instructed the jury that "loss of use" damages did not include "*increased operating and maintenance costs* and it doesn't include system upgrades, making it better than it was before." Trial Tr. 100:7–10 (emphasis added). The Court further instructed the jury that the following items were not covered as "loss of use" damages:

fraud; money for repairs other than emergency response costs; retrofit; loss of goodwill; loss of business opportunity; lost profits; investigation costs; costs of product replacement; and costs associated with moving the units from the top of the towers to the bottom. *Id.* 100:10–101:16.[2]

The Court's instructions on "loss of use" damages were consistent with applicable authority. The Court's car insurance example emphasized that rental value is one measure of "loss of use" damages. The Court further instructed the jury, however, that "loss of use" damages are not limited to rental value, but include "those reasonably understood emergency response costs to get the system up and running." *Id.* at 98:17–18. These instructions were consistent with the "nexus" requirement set forth in *Atmel*, as well as the "loaner" scanners damages that were deemed covered "loss of use" damages in *Anthem.*

Here, the jury returned a general verdict in favor of Vicor and assessed "loss of use" damages in the amount of $17,300,000. With respect to the $8,000,000 portion of the jury award, Vicor had introduced Amendment # 11 to the Ericsson–Cricket System Equipment Purchase Agreement ("Amendment # 11"). Vicor's position during trial was that the entire amount paid in accordance with Amendment # 11 was covered "loss of use" damages. Under the section titled "Settlement Payment", Amendment # 11 states as follows:

[Ericsson] agrees to pay [Cricket] an amount equal to Eight Million Dollars ($8,000,000) (the "Settlement Payment")

---

**2.** The parties raised various objections to the Court's jury charge. With respect to the issues before the Court in the post-trial motions, Continental objected to the Court's definition of "loss of use" damages to the extent that it provided coverage for repair of the product found to be defective. Trial Tr. 121:10–13. The objection was noted but the Court was satisfied with the charge. *Id.* at 121:14–16. Vigilant and Federal requested that "emergency" be defined as "the time reasonably necessary to repair or replace" the product. *Id.* at 120:17–121:9. The Court so instructed. *Id.* at 122:14–23.

... in installments as follows: (i) the amount of Four Million Dollars ($4,000,000) ... (such installment the "Reimbursement Payment") and (ii) the amount of Four Million Dollars ($4,000,000) ... (such installment the "Offset Payment"). The parties agree that the Reimbursement payment is a reimbursement of the $4,000,000 paid by [Cricket] to [Ericsson] pursuant to Section 5(a) of the Settlement Agreement and the Offset Payment is made to [Cricket] to offset increased operating and maintenance expenses incurred by [Cricket].

In addition, Amendment # 11 contained a provision requiring Ericsson to relocate all tower-mounted units to the ground level, an obligation that Ericsson later discharged with a onetime payment of $1,520,000 to Cricket.[3]

Vicor had also introduced some rather vague evidence through Michael Rasmussen ("Rasmussen"), Chief Financial Officer for one of Ericsson's business units, to the effect that Ericsson had agreed to Amendment # 11 to compensate Cricket for damages caused by the network outages due to Vicor power converter failures. Specifically, Rasmussen testified:

Q: And what were the components of the settlement reached with Ericsson—I mean with Cricket?

A: Those were all along the same lines. There were some, if I recall correctly, monetary compensation and then there were—then there were some compensation in terms of bringing the net—I won't call it compensation but bringing the network back to a satisfactory performance level. And then there were some free-of-charge equipment and services to compensate for the damages caused by their ability to service their customers.

Trial Tr., 75:23–76:7, November 6, 2008.

■ As noted above, while the Court instructed the jury that "loss of use" damages included emergency response costs, it had further instructed the jury that "loss of use" damages did not include, *inter alia,* increased maintenance and operating costs. Amendment # 11 specifically allocated $4,000,000 as an Offset Payment to offset increased operating and maintenance costs. Even drawing all favorable inferences from Rasmussen's testimony in support of the jury's verdict, the plain language of Amendment # 11 forecloses a verdict for Vicor upon Ericsson's $4,000,000 Offset Payment, and the jury verdict in this case ought be reduced by that amount.

■ The Court recognizes that one course of action would be to grant a remittitur. Were the Court to grant a remittitur, it would order a conditional new trial, to be held if Vicor refused to remit the $4,000,000 attributable to the Offset Payment. Fed.R.Civ.P. 50(b). The Court is of opinion, however, that ordering a conditional new trial is unnecessary and illogical given the agreement among all parties as to the precise allocation of the jury award and that there is only one plausible basis for this portion of it. *See, e.g., Garfield Aniline Works v. Zendle,* 43 F.2d 537, 538 (3d Cir.1930) (holding reduction of judgment appropriate in contract action when excess is readily ascertainable, rather than remittitur resulting possibly in lengthy retrial); *Scott v. Plante,* 641 F.2d 117, 136–37 (3rd Cir.1981), *cert. granted, judgment vacated on other grounds,* 458 U.S. 1101,

---

**3.** The parties agree that the jury followed the Court's instruction that costs associated with moving the units from the top of the towers to the bottom are not covered "loss of use" damages and the jury did not include that in its award of damages.

102 S.Ct. 3474, 73 L.Ed.2d 1362 (1982) (distinguishing case from *Zendle* where "amount of damage [was] a matter of undisputed calculation"); *Eastern Assoc. Coal Corp. v. Aetna Cas. & Sur. Co.*, 475 F.Supp. 586, 593–94 (W.D.Pa.1979), *rev'd on other grounds*, 632 F.2d 1068 (3d Cir. 1980), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 843 (1981) ("In view, however, of the fact that the figures are definite … the matter can be handled by a reduction of judgment pursuant to Rule 50(b)."). Here, pursuant to Federal Rule of Civil Procedure 50(b)(3), the proper course is for the Court to reduce the jury award by the $4,000,000 attributable to the Offset Payment in Amendment #11 as contrary to the charge of the Court and unsupported by the evidence.

Accordingly, Vigilant and Federal's motion for judgment as matter of law or, alternatively, a new trial [Doc. 134], and Continental's motion for judgment as matter of law [Doc. 144] are ALLOWED to the extent that the jury award is reduced by $4,000,000 for the period October 1, 2002 through September 30, 2003. The motions are DENIED in all other respects. Vigilant and Federal's motion for a new trial [Doc. 135] is DENIED. The parties jointly shall submit a revised form of judgment within thirty days of the date hereof.

SO ORDERED.