**AETNA CASUALTY AND SURETY COMPANY, a Connecticut Corporation, et al., Plaintiffs-Appellees,**

v.

**JEPPESEN & COMPANY, a Colorado Corporation, Defendant-Appellant.**

**No. 79–3075.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 10, 1980.

Decided April 20, 1981.

Philip R. McCowan, San Jose, Cal., argued, for defendant-appellant; Bruce C. Janke, San Jose, Cal., on brief.

Rex A. Jemison, Beckley, Singleton, Delanoy, Las Vegas, Nev., for plaintiffs-appellees.

Before MERRILL and KENNEDY, Circuit Judges, and HARRIS,* District Judge.

* Honorable Oren Harris, Senior United States District Judge of the Eastern District of Arkansas, sitting by designation.

MERRILL, Circuit Judge:

This appeal is taken from judgment granting Aetna Casualty and Surety Company indemnity from Jeppesen & Company for money paid by Aetna in settlement of wrongful death actions filed by representatives of passengers killed in a plane crash. We reverse.

On November 15, 1964, a Bonanza Airlines plane crashed in its approach to Las Vegas, Nevada, on a flight from Phoenix, Arizona. All on board were killed. Wrongful death claims filed on behalf of the passengers were settled by Bonanza, with Aetna as Bonanza's insurer paying to the extent of Bonanza's coverage.

Jeppesen publishes instrument approach charts to aid pilots in making instrument approaches to airports. Aetna contends that the chart for the Las Vegas Airport was defective, and that product defect was the cause of the crash. Asserting product liability on the part of Jeppesen, it brought this action in the District Court for the District of Nevada as Bonanza's subrogee, seeking to recover from Jeppesen the sums it has paid in settlement of the wrongful death claims.[1] Following bench trial, the court found that the chart was defective; that the defect was the proximate cause of the crash; that Bonanza was negligent in failing to discover the defect and alert its pilots; and that the crew members were not negligent in relying on the defective chart. The court apportioned damages between Bonanza and Jeppesen on the basis of its findings of comparative fault: 80 percent to Jeppesen and 20 percent to Bonanza. It is from that judgment that Jeppesen has taken this appeal.

### 1. *Jury Trial*

■ Jeppesen first contends that the court abused its discretion in denying motion for jury trial.

Jeppesen was very late in requesting a jury (five years after commencement of the action), giving as explanation that counsel had misunderstood the federal rules. Fed. R.Civ.P. 38(b) requires that a demand for trial by jury on any issue triable as of right be made any time after the commencement of the action but not later than 10 days after service of the last pleading directed to such issue. (By Jeppesen's calculations, it was 50 days late in requesting a jury, counting from the filing of its third amended complaint. By Aetna's calculations, Jeppesen was 22 months late, since the third complaint did not add any new issues which would have reopened the time for making a jury demand.)

Although the trial judge has discretion under Fed.R.Civ.P. 39(b) to grant relief from waiver, this court has held that it is not an abuse of discretion to refuse such relief where mere inadvertence is the excuse offered by tardy counsel. *Mardesich v. Marciel*, 538 F.2d 848 (9th Cir. 1976). We find no abuse of discretion here.

■ Jeppesen contends further that denial of the motion was abuse of discretion, since it was predicated on a mistake of law: the judge's belief that the case raised only equitable issues which would not entitle appellant to a jury trial. We do not read the record as indicating that the court believed it was without discretionary power to grant a jury trial, but rather that the nature of the case was such that a bench trial would be preferable to a jury trial. We find no abuse of discretion.

### 2. *Finding Respecting Product Defect*

■ Jeppesen contends that the record does not support the court's finding that the instrument approach chart was defective.

Jeppesen approach charts depict graphically the instrument approach procedure for

1. The same theory of product defect had been the basis of an action brought against Jeppesen by representatives of the deceased crew members. The case was bifurcated and the issue of liability was sent to the jury, which found for plaintiffs. Before the issue of damages was tried, the case was settled. The parties stipulated that the court should vacate the jury verdict as if motion for new trial had been granted. This was done, and the case then was dismissed with prejudice.

the particular airport as that procedure has been promulgated by the Federal Aviation Administration (FAA) after testing and administrative approval. The procedure includes all pertinent aspects of the approach such as directional heading, distances, minimum altitudes, turns, radio frequencies and procedures to be followed if an approach is missed. The specifications prescribed are set forth by the FAA in tabular form. Jeppesen acquires this FAA form and portrays the information therein on a graphic approach chart. This is Jeppesen's "product." The parties do not dispute that the information thus contained in Jeppesen's Las Vegas approach chart is in all respects accurate. The defect, if any, is in the graphic presentation of that information.

Each chart portrays graphically two views of the proper approach. The top portion is the "plan" view, depicted as if one were looking down on the approach segment of the flight from directly above. The bottom portion depicts the "profile" view, presented as a side view of the approach with a descending line depicting the minimum allowable altitudes as the approach progresses. The plan view is regarded as a superior method of presenting course and course changes; the profile view as a superior method of presenting altitude and altitude changes. Each chart thus conveys information in two ways: by words and numbers, and by graphics.

The plan view correctly shows the minimum altitude at a distance of 15 miles from the Las Vegas Airport as 6,000 feet. The profile view does not extend beyond three miles from the airport. Both plan and profile views correctly show the minimum altitude at a distance of three miles from the airport as 3,100 feet. The "defect" in the chart consists of the fact that the graphic depiction of the profile, which covers a distance of three miles from the airport, appears to be drawn to the same scale as the graphic depiction of the plan, which covers a distance of 15 miles. In fact, although the views are the same size, the scale of the plan is five times that of the profile.

Aetna produced as witness an aviation psychologist, who testified that most Jeppesen approach charts have the same or roughly the same scale for both plan and profile views; that a pilot and navigator would come to take this for granted, and, when faced with the Las Vegas chart would assume that the altitude shown on the profile as proper for three miles distant would, reading it as drawn to the same scale as the plan, be proper for 15 miles distant. The theory of Aetna was that the crash was due to pilot reliance on this faulty assumption, invited by the difference in scale. It contends that this difference in scale created a conflict between the information conveyed by the graphics of the chart and that conveyed in words and numbers, and that this conflict rendered the chart defective.

Jeppesen disputed Aetna's claim that it was the custom of the chartmakers to draw the profile and plan views to the same scale. In addition, Jeppesen produced experienced pilots as witnesses who testified that they had never made assumptions such as those attributed to the Bonanza flight crew, and had never heard of any pilots who had. Jeppesen contends that Aetna has failed completely to make out a case of product defect. We cannot agree.

While the information conveyed in words and figures on the Las Vegas approach chart was completely correct, the purpose of the chart was to translate this information into an instantly understandable graphic representation. This was what gave the chart its usefulness—this is what the chart contributed to the mere data amassed and promulgated by the FAA. It was reliance on this graphic portrayal that Jeppesen invited.

The trial judge found that the Las Vegas chart "radically departed" from the usual presentation of graphics in the other Jeppesen charts; that the conflict between the information conveyed by words and numbers and the information conveyed by graphics rendered the chart unreasonably dangerous and a defective product.

■ Under Nevada law a plaintiff can recover for injuries caused by use of a product with a defective design which makes it

unsafe for its intended use, so long as the plaintiff is unaware of the defect at the time of use. *Worrell v. Barnes*, 87 Nev. 204, 207, 484 P.2d 573, 575–76 (1971). *See* Restatement (Second) of Torts § 402A. On these facts, we conclude that the court's finding that the product was defective is not clearly erroneous.

### 3. Finding Respecting Crew Negligence

■ The district court found that the members of the crew had relied on the graphic portrayal contained in the chart and were misled into assuming that it was safe to fly at an altitude of 3,100 feet 15 miles from the field; that they had acted upon that assumption; and that in making that assumption, which resulted in the fatal crash, they were free from negligence. It is here where we part company with the district court.

To find that Jeppesen's product defect was a proximate cause of the crash we must hypothesize pilot reliance on the graphics of the chart and complete disregard of the words and figures accompanying them. We reject outright a standard of care that would consider such conduct as reasonable attention to duty by a pilot of a passenger plane. The only testimony as to standard of care—that of expert pilots (including Aetna's aviation psychologist)—is flatly to the contrary. We hold that the district court was clearly erroneous in finding the members of the crew to be free from negligence in allowing themselves to be misled by variance in scale between the plan and the profile. For purposes of apportioning damages, the extent to which that negligence contributed to the crash remains to be decided.

### 4. Choice of Law

■ Jeppesen contends that the district court failed to apply the law of Nevada with respect to apportionment of damages. The district court held that there was no applicable Nevada law, and that if presented with the question the Nevada Supreme Court would adopt the position of the California Supreme Court and apply the princi-

ples of comparative fault. Jeppesen contends that the case of *Reid v. Royal Insurance Co.*, 80 Nev. 137, 390 P.2d 45 (1964), rejects the principles of comparative negligence and denies indemnity to a party who is himself at fault, however slight that fault may be. We disagree.

*Reid* purports to deny indemnity only in the circumstances of that case, where the parties were equally at fault and had equal knowledge of the danger and opportunity to guard against it. It does not attempt to state a general indemnity rule nor address the issue whether indemnity should be denied to a party whose fault was a lesser cause of the injury. This court has already noted that Nevada decisions on implied indemnity (including *Reid*), are less than clear. *See Santisteven v. Dow Chemical Co.*, 506 F.2d 1216, 1218 (9th Cir. 1977). We find no error in the court's choice of law.

### 5. Apportionment of Damages

■ The district court apportioned damages on the basis of the comparative fault doctrine adopted in California in *Li v. Yellow Cab Co. of California*, 13 Cal.3d 804, 532 P.2d 1226, 119 Cal.Rptr. 858 (1975), noting that this doctrine has since been enlarged to apply to product liability cases. *Daly v. General Motors Corp.*, 20 Cal.3d 725, 575 P.2d 1162, 144 Cal.Rptr. 380 (1978). Under this system, a defendant remains strictly liable for injuries caused by a defective product, but plaintiff's recovery is reduced to the extent that its lack of reasonable care contributed to the injury. *Daly, supra*, 20 Cal.3d at 736–37, 575 P.2d at 1168, 144 Cal.Rptr. at 386.

In computing damages, the district court applied the comparative fault doctrine by looking to "the consequence of fault on the part of each of the parties and the possible damages which might arise from such fault," thus taking into account the potential for harm that could flow from the conduct of each of the parties. The court regarded the extent of Bonanza's fault in failing to alert its crew members to the variance in scale as limited to this flight alone. Jeppesen, however, was charged with the potential loss of life that might

occur on any flight using its charts. Jeppesen asserts that this method of apportioning damages was in error, and we agree.[2]

California law apportions indemnity according to the extent that each party's fault contributed to the original accident; this is true even if the original basis for liability of each defendant differed. *Safeway Stores, Inc. v. Nest-Kart*, 21 Cal.3d 322, 579 P.2d 441, 146 Cal.Rptr. 550 (1978) (negligent defendant found 80 percent at fault while strictly liable defendant found 20 percent at fault; indemnity apportioned accordingly); *see also Pan Alaska Fisheries, Inc. v. Marine Constr. & Design Co.*, 565 F.2d 1129, 1139 (9th Cir. 1977). Inasmuch as the district court properly held that Nevada would follow California law, we believe that *Nest-Kart* states the rule applicable here. Accordingly, we reverse and remand with instructions to reapportion indemnity under the standards enunciated in *Nest-Kart*, with the negligence of the plane's crew appropriately considered.

### 6. *Other Issues*

We find no support in the record for appellant's claim that the trial judge denied it due process by prejudging the merits of this case, nor do we find that the court gave collateral estoppel effect here to the action brought against Jeppesen by representatives of the deceased crew members. *See* footnote 1, *supra*.

Judgment is vacated and the matter remanded for a reapportionment of damages. No costs are awarded.

---

2. Even accepting the court's standard, Bonanza's duty was not limited to the passengers on this flight. It is hardly fair to take potential future harm into consideration in computing Jeppesen's liability but not Bonanza's.