**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SONY COMPUTER ENTERTAINMENT
AMERICA, INC.,
                    *Plaintiff-Appellant,*

v.

AMERICAN HOME ASSURANCE
COMPANY and AMERICAN
INTERNATIONAL SPECIALTY LINES
INSURANCE COMPANY,
                    *Defendants-Appellees.*

No. 05-17425

D.C. No.
CV-04-00492-PJH

OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
November 5, 2007—San Francisco, California

Filed July 15, 2008

Before: Mary M. Schroeder, Cynthia Holcomb Hall and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Hall;
Partial Concurrence and Partial Dissent by Judge Bybee

**COUNSEL**

Martin H. Myers, Heller Ehrman, San Francisco, California, for the plaintiff-appellant.

Thomas H. Sloan, Jr., Krieg, Keller, Sloan, Reilley & Roman, San Francisco, California, for defendant-appellee American International Specialty Lines Insurance Company.

Lane J. Ashley and Rebecca R. Weinreich, Lewis, Brisbois, Bisgaard & Smith, Los Angeles, California, for defendant-appellee American Home Assurance Company.

**OPINION**

HALL, Circuit Judge:

Sony Computer Entertainment America, Inc. appeals the district court's summary judgment in favor of defendants American International Specialty Lines Insurance Company and American Home Assurance Company. Sony sued the sister insurance companies for failing to indemnify and defend it in a class action suit alleging product defects in a video game system known as the Sony PlayStation 2. The district court found that neither insurance company had a duty to indemnify or defend Sony in the lawsuit. We affirm.

### I.   FACTS AND PROCEDURAL HISTORY

*A.   Sony and the PlayStation 2*

Sony markets, distributes, and supports the PlayStation family of products. The PlayStation 2 is the successor to the

original PlayStation, an advanced computer console. The PlayStation 2 plays video games designed for the system on either CD discs or DVD discs, as well as games designed for the original PlayStation. Unlike the original PlayStation, however, the Playstation 2 was marketed as a home entertainment system, able to play audio and video CDs and DVDs as well as video games.

### B.  The Insurance Policies

#### 1.  American International Specialty Lines Insurance Company Policy

Sony purchased a $10 million media liability insurance policy from American International Specialty Lines Company (AISLIC) for the period of July 1, 2001 to July 1, 2002. The policy, entitled "Multimedia Professional Liability Policy," provided that AISLIC would indemnify Sony in certain lawsuits. AISLIC promised to "pay on [Sony's] behalf those amounts . . . that [Sony] is legally obligated to pay as damages . . . resulting from any claim . . . during the policy period for [Sony's] wrongful act in the business of the insured." The term "wrongful act" was defined to include (a) defamation, (b) invasion of privacy or publicity, (c) infringement of copyright, title, slogan, trademark, or trade dress, (d) unfair competition (but only in conjunction with wrongful acts described in section (c)), (e) unauthorized use of name or likeness, (f) unintentional failure to credit on a matter, and (g) defective advice, incitement, or "negligent publication."[1] The policy had a $100,000 deductible "for each wrongful act or series of wrongful act(s)."

The AISLIC policy did not obligate AISLIC to defend Sony in every lawsuit alleging a covered wrongful act.

---

[1]Sony previously held an insurance policy with AISLIC that also covered "any error or omission, misstatement, misleading statement or misinterpretation," but the 2001-2002 policy did not include such coverage.

Rather, it stated that AISLIC had "the right but not the duty to defend any claim first made against [Sony] during the policy period and reported to [AISLIC] in writing for [Sony's] wrongful act." However, the policy provided that AISLIC would be responsible for at least part of Sony's defense costs. If Sony chose its own counsel in a suit alleging a covered wrongful act, it would pay for its own defense until its deductible was exhausted, and then for a portion of it after the deductible was exhausted. If Sony was defended by AISLIC's chosen counsel, AISLIC would be responsible for all defense costs after Sony paid its deductible.

The AISLIC policy excluded a number of claims from policy coverage. For example, AISLIC was not obligated to pay damages arising from "unfair or deceptive business practices including, but not limited to, violations of any local, state or federal consumer protection laws" (Exclusion C), "alleging or arising out of a breach of any express warranties, representations or guarantees" (Exclusion J), or "arising out of false advertising or misrepresentation in advertising" (Exclusion P). This last exclusion had an exception, whereby AISLIC promised to "defend suits alleging [false advertising or misrepresentation in advertising] until there is a judgment, final adjudication, adverse admission or finding of fact against [Sony] at which time [Sony] shall reimburse [AISLIC] for claim expense."

### 2. American Home Assurance Company Policy

Sony purchased a $2 million general commercial insurance policy from American Home Assurance Company (American Home) for the period of April 1, 2000 to April 1, 2001. The policy, entitled "Commercial General Liability Coverage," provided that American Home would "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage,' " as well as "defend the insured against any 'suit' seeking those damages." Property damage was defined to include both "physical injury to

tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not injured."

As with the AISLIC policy, a number of exclusions in the American Home policy limited American Home's duties. In particular, under Exclusion (m), the policy did not cover " 'property damage' to 'impaired property' or property that has not been physically injured, arising out of . . . a defect, deficiency, inadequacy, or dangerous condition in '[Sony's] product.' " Exclusion (m) had an exception for the loss of use of property "arising out of sudden and accidental physical injury to '[Sony's] product' or '[Sony's] work' after it has been put to its intended use."

### C. *Kim/Kaen Lawsuits*

In July 2002, PlayStation users sued Sony in two separate class actions in California state court, later consolidated as the *Kim/Kaen* case in San Mateo County. The *Kim/Kaen* plaintiffs alleged that the PlayStation 2s suffered from an "inherent" or "fundamental" design defect that rendered them unable to play DVDs and certain game discs. The complaints set forth causes of action for breach of express and implied warranties, fraud, negligent misrepresentation, bad faith, violations of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750 et seq.), false advertising (Cal. Bus. & Prof. Code § 17500 et seq.), and unfair business practices (Cal. Bus. & Prof. Code § 17200 et seq.). The assertions in the false advertising and negligent misrepresentation claims primarily revolved around Sony's statements in press releases, advertising, product packaging, and instruction manuals that the PlayStation 2 would function as a DVD player as well as a game player.

### D. *This Action*

Sony tendered the *Kim/Kaen* claims to AISLIC and American Home, both of which eventually denied coverage. Sony

filed this action in February 2004, claiming that AISLIC and American Home had breached their contractual duty to defend and indemnify Sony, and breached the implied covenant of good faith and fair dealing.

American Home moved for summary judgment on all counts, and Sony moved for partial summary judgment on the duty to defend claim. The district court granted summary judgment in favor of American Home. It found that American Home had no duty to defend Sony in the suit, and that, accordingly, the indemnification and bad faith claims failed as well. *Sony Comp. Entm't Am.*, *Inc. v. Am. Home Assur. Co.*, No. CV 04-00492-PJH (N.D. Cal. Aug. 30, 2005).

Later that year, AISLIC moved for summary judgment on all claims and Sony cross-motioned with respect to the duty to defend claim. The district court granted summary judgment in favor of AISLIC, finding that AISLIC had no duty to indemnify or defend Sony in the *Kim/Kaen* suits, and that AISLIC had not engaged in any bad faith. *Sony Comp. Entm't Am.*, *Inc. v. Am. Home Assur. Co. and Am. Int'l Specialty Lines Ins. Co.*, No. 05-17425, 2005 U.S. Dist. LEXIS 30424 (N.D. Cal. Dec. 1, 2005). Sony timely appealed.

## II.   DISCUSSION

### A.   Standard of Review

A district court's grant of summary judgment is reviewed de novo. *Suzuki Motor Corp. v. Consumers Union of United States, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). "We must therefore determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* at 1131-32 (citing *Devereax v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc)).

*B. Principles of Insurance Policy Interpretation*

Though insurance contracts have special features, the general rules of contract interpretation still apply in California. *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992); *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003). The interpretation of a contract must "give effect to the 'mutual intention' of the parties . . . at the time the contract was formed." *Id.* (citing Cal. Civ. Code § 1636). Such intent is to be inferred, if possible, from the written provisions of the contract based on their "ordinary and popular sense," unless a "technical sense or special meaning is given to them by their usage." *Id.* at 647-48 (citing Cal. Civ. Code §§ 1639, 1644, 1638). If the contractual language is clear and explicit, it governs. *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990).

[1] The terms in an insurance policy must be read in context and in reference to the policy as a whole, with each clause helping to interpret the other. Cal. Civ. Code § 1641; *Bay Cities Paving & Grading*, *Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 867 (1993); *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999). Accordingly, a provision is ambiguous "*only* if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole." *Id.*; *see also Bank of the W.*, 2 Cal. 4th at 1265 (" '[L]anguage in a contract must be construed in the context of the instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' ") (quotation source and emphasis omitted). A court faced with an argument for coverage based on an assertedly ambiguous policy language "must first attempt to determine whether coverage is consistent with the insured's reasonable expectations," *id.*, and "[i]n so doing . . . must interpret the language in context, with regard to its intended function within the policy," *id*. Thus, although unresolved ambiguities in insurance policies are generally construed against the insurer, *AIU Ins. Co.*, 51 Cal. 3d at 822, that prin-

ciple only applies if the meaning of a term is ambiguous in light of the policy as a whole, and if coverage is within the objectively reasonable expectations of the insured. *Bank of the W.*, 2 Cal. 4th at 1265.

## C.   AISLIC Had No Duty to Indemnify or Defend Sony

The AISLIC policy obligated AISLIC to indemnify Sony and provide defense costs for lawsuits arising from certain "wrongful acts," including "negligent publication." Sony argues that the district court erred in granting summary judgment in favor of AISLIC because the false advertising and negligent misrepresentation claims in the *Kim/Kaen* lawsuits allege "negligent publication." Alternatively, Sony argues that AISLIC is obligated to defend it in the *Kim/Kaen* suits by virtue of Exclusion P of the insurance policy. We disagree and affirm the district court.

### 1.   *The affirmative coverage provisions of the AISLIC policy do not obligate AISLIC to indemnify or defend Sony*

We begin our analysis by examining the policy's affirmative coverage clauses, because if a claim does not fall within those clauses, no coverage exists. *Palmer*, 21 Cal. 4th at 1115-16. Sony does not assert that any wrongful act besides "negligent publication" applies to the *Kim/Kaen* lawsuits, thus the question of whether AISLIC's policy covers Sony turns on whether the *Kim/Kaen* lawsuits assert claims within the meaning of that term.

#### i.   *Meaning of "negligent publication"*

[2] "Negligent publication" is not defined in the AISLIC policy, nor does it appear in lay or legal dictionaries or in any California statute. Because there is no evidence that the parties intended the term to carry a technical meaning, the ordinary and popular meaning of the term governs. *AIU Ins. Co.*, 51 Cal. 3d at 823; *see also* Cal. Civ. Code § 1644.

Sony argues that the term "negligent publication" should have a broad meaning which it derives from stringing together the dictionary definitions of "negligent" and "publication." According to Sony, "negligent publication" in the AISLIC policy refers to "a communication of information to the public, lacking or exhibiting a lack of due care or concern." Sony argues that this definition, broad enough to include the false advertising and negligent misrepresentation claims in the *Kim/Kaen* lawsuits, is the plain meaning of the term.

Sony's definition is not the proper plain meaning of the term. While Sony is correct that courts often consult dictionaries to derive the ordinary and popular meaning of terms in insurance contracts, *see Scott v. Continental Ins. Co.*, 44 Cal. App. 4th 24, 29-30 (Ct. App. 1996), Sony's definition is inconsistent with the context of the AISLIC policy as a whole, *see id.* at 29 n.4 ("[T]he multiple meanings of a word as found in a dictionary cannot be inserted into the text of an insurance policy without regard to the document construed as a whole, [and] the exact context of the language."); *MacKinnon*, 31 Cal. 4th at 649 ("Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context."); *Palmer*, 21 Cal. 4th at 1116-17.

**[3]** The policy Sony purchased from AISLIC covered Sony for wrongful acts defined in seven different sections, each including a list of related terms. For example, part (a) included "defamation, disparagement, or harm to the character or reputation of any person, or entity"; part (b) listed "invasion, infringement, or interference with rights of privacy or publicity"; parts (c), (d), (e), and (f) covered copyright infringement, unfair competition, unauthorized use of name or likeness, and unintentional failure to credit on a matter, respectively. Part (g) read that wrongful acts also consisted of "defective advice, incitement, and negligent publication." Given that sections (a)-(f) each listed a series of related torts,

the placement of "negligent publication" within the policy suggests that the term refers to a narrow tort relating to defective advice and incitement, not a broad tort distinct from those terms. *See Am. Motorists Ins. Co. v. Allied-Sysco Food Services, Inc.*, 19 Cal. App. 4th at 1347, 1350-51 (Ct. App. 1993) (agreeing with the insurer that "the policy's coverage for damages arising out of 'humiliation' is limited to those cases in which humiliation damages arise out of the types of torts in which it is grouped — i.e., libel, slander, defamation of character, and invasion of the right to privacy"), *overruled on other grounds in Buss v. Superior Court*, 16 Cal. 4th 35, 50 & n.12 (1997). Yet, Sony's expansive definition of "negligent publication" disregards the term's placement in wrongful act (g) next to incitement and defective advice. If "negligent publication" were defined as Sony suggests — a communication of information to the public, lacking or exhibiting a lack of due care or concern — then the term would be broad enough to subsume virtually all of the other wrongful acts defined in the policy, such as defamation, misappropriation, infringement of copyright, unauthorized use of name or likeness, and unintentional failure to credit on a matter. Such a reading ignores the maxim that "a court must interpret . . . [policy] language in context, with regard to its intended function in the policy," *Bank of the W.*, 2 Cal. 4th at 1265.

[4] Further, the AISLIC policy was a media liability policy. Its affirmative coverage provisions were strictly limited to the types of claims normally faced by media publishers, such as defamation, copyright infringement, and so on. Notably absent from those provisions was any coverage for product defects. In fact, the exclusions in the policy made clear that it was not intended to protect Sony from suits like *Kim/Kaen*. AISLIC explicitly disclaimed liability for suits alleging breach of warranties, representations, or guarantees (Exclusion J); for suits arising from violations of consumer protection laws (Exclusion C); and for suits alleging false advertising or misrepresentation in advertising (Exclusion P).[2]

---

[2]Sony argues that Exclusion P "provides strong evidence of coverage" because AISLIC would only have included the exclusion if it believed that

Sony's expansive interpretation of "negligent publication" fails to recognize the limited coverage in the AISLIC media liability policy, and thus fails to properly construe "the language in a contract . . . in the context of that instrument as a whole." *Bank of the W.*, 4 Cal. 4th at 1265.

Sony's construction of "negligent publication" is also unpersuasive because it is not supported by the case law, which we look to as further evidence of the proper meaning of the term. *See AIU*, 51 Cal. 3d at 825-28. Though the cases do not yield one clear definition of "negligent publication," the cases that reference the term are a limited set, none of which use the term as broadly as Sony does.

For example, in one line of cases, "negligent publication" is used to describe a cause of action in which plaintiffs attempt to hold publishers liable for material that led readers to engage in harmful conduct. *See*, *e.g. Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 232-34 (Tex. App. 1993) (plaintiff sued magazine for the "negligent publication" of an advertisement for firearms that she alleged led her son to accidentally kill himself); *Smith v. Linn*, 563 A.2d 123, 125 (Pa. Super. Ct. 1989) (plaintiff sued the publisher of a diet book, claiming that his wife — who read the book and followed its instructions — died of cardiac arrest due to the book's "negligent publication"); *Hyde v. City of Columbia*, 637 S.W. 2d 251, 253 (Mo. Ct. App. 1982) (abduction victim brought action against newspaper for the negligent publication of her name and address while her assailant was still at large); *see also Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830 (5th Cir. 1989) (son and mother of murder victim sued maga-

false advertising was otherwise covered. This type of argument has been rejected by California courts as "superficial and contrary to proper coverage analysis." *Old Republic Ins. Co. v. Superior Court*, 66 Cal. App. 4th 128, 145 (Ct. App. 1998), *overruled on other grounds in Vandenberg v. Superior Court*, 21 Cal. 4th 815, 838 n.12, 839 (1999).

zine for publishing gun for hire advertisement through which victim's husband hired assassin to kill her).

Other courts have used the term "negligent publication" to explain that creative pleading does not change the analysis of a defamation-based claim or applicable privileges, *see, e.g.*, *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 695 (9th Cir. 1998); *Block v. Sacramento Clinical Labs, Inc.*, 131 Cal. App. 3d 386, 392-93 (Ct. App. 1982), or to describe one of the elements of a defamation action, *see, e.g.*, *Mandel v. Boston Phoenix*, 456 F.3d 198, 209 (1st Cir. 2006); *Reilly v. Associated Press*, 797 N.E. 2d 1204, 1209 n.3 (Mass. App. Ct. 2003). In addition, "negligent publication" has been used to describe negligence on the part of advertisers who breached contracts by erroneously printing plaintiff's information. *See, e.g.*, *Continental Kennel Club, Inc. v. Fancy Publ'ns, Inc.*, 763 So. 2d 827, 828 (La. App. 2000); *Discount Fabric House of Racine, Inc. v. Wisconsin Tel. Co.*, 345 N.W.2d 417, 425 (Wis. 1984).

Thus, while the term "negligent publication" has been used in a variety of cases, no case uses the term as expansively as Sony suggests. Sony would have "negligent publication" mean "a communication of information to the public, lacking or exhibiting a lack of due care or concern," yet the case law is essentially limited to plaintiffs suing publishers for the contents of books, articles, or advertisements. A couple of cases have involved plaintiffs suing individuals or governments — rather than publishers — for defamation or related claims, *see, e.g.*, *Block*, 131 Cal. App. 3d at 392-93, but even their use of the term remains entirely distinct from Sony's proffered definition.

In light of the above, we cannot adopt Sony's definition of "negligent publication" as the meaning of the term in the AIS-LIC policy. A more limited definition of the term is appropriate, one that is consistent with the context of the policy and supported in the case law. We find that defining the term

"negligent publication" as a narrow tort in which the publication of material leads the reader to commit a harmful act meets these criteria.

This definition of "negligent publication" is supported by the *Smith*, *Way*, and *Hyde* line of cases, which involved plaintiffs who sued publishers for harm resulting from the contents of a book, magazine, or newspaper. The legal literature is also helpful in this respect; scholars have recognized "negligent publication" as a cause of action in which plaintiffs attempt to hold a publisher liable for harm encouraged or instructed by a publication.[3]

More importantly, defining "negligent publication" in this manner is consistent with the context of the AISLIC policy. Recall that "negligent publication" was placed next to defective advice and incitement in the AISLIC policy. Our definition of "negligent publication" appropriately describes a tort similar to those wrongful acts. For example, in incitement cases, like in "negligent publication" cases, the plaintiff alleges that defendant's publication of material encouraged or instructed the reader to commit a harmful act. However, the plaintiff asserts incitement on the part of the defendant as well as negligence in an effort to avoid First Amendment problems. *See*, *e.g.*, *Herceg v. Hustler Magazine, Inc.*, 814 F.2d

_____

[3]*See*, *e.g.*, Susan M. Gilles, *"Poisonous" Publications and Other False Speech Physical Harm Cases*, 37 Wake Forest L. Rev. 1073, 1081-83 (2002) ("[A]ctions for negligent publication . . . [involve plaintiffs who] sue publishers and assert that by publishing false statements that cause physical harm, the defendants have breached a duty to independently investigate the accuracy of the text.") (citing *Smith* as an example); *see also* Mark Sableman, *Link Law Revisited: Internet Linking Law at Five Years*, 16 Berkeley Tech. L.J. 1273, 1316 n.235 (2001) (" '[N]egligent publication' theory seeks to hold a publisher liable for publishing material that instructs and/or encourages readers in committing violent or other unlawful conduct."); Charles A. Glasser, Jr. & Mark A. Sirota, *Outline of Decisions Involving "Negligent Publication" and Products Liability Claims Against Publishers*, 516 Practising Law Inst. 719, 721 (1998) (citing *Way*).

1017, 1018-19 (5th Cir. 1987) (plaintiff claimed that a Hustler article about erotic asphyxiation incited her son to attempt the practice, which led to his death); *Yakubowicz v. Paramount Pictures Corp.*, 536 N.E.2d 1067, 1070-71 (Mass. 1989) (plaintiff claimed film incited teenagers to kill his son); *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 999-1001 (Ct. App. 1988). The term defective advice can be described as a related theory of liability, in which plaintiffs argue that the "advice" in a publication is a "defective product," and attempt to hold the publisher strictly liable. *See*, *e.g.*, *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034-36 (9th Cir. 1991) (plaintiffs became ill after eating poisonous mushrooms labeled as edible in book and asserted defective product claims against the publisher); *Lewin v. McCreight*, 655 F. Supp. 282, 282-83 (E.D. Mich. 1987) (plaintiffs experienced an explosion while following instructions in a book and sued the publisher for "defective ideas"); *Aetna Cas. & Sur. Co. v. Jeppesen & Co.*, 642 F.2d 339, 341-43 (9th Cir. 1981); *see also* Sandra Davidson, *Blood Money: When Media Expose Others to Risk of Bodily Harm*, 19 Hastings Comm. & Ent. L.J. 225, 248-90 (1997) (describing plaintiffs' efforts to hold media entities liable for harmful content under negligence, incitement, and products liability theories); Terri R. Day, *Publications that Incite, Solicit, or Instruct: Publisher Responsibility or Caveat Emptor?*, 36 Santa Clara L. Rev. 73 (1995) (same).

We find that defining "negligent publication" as a tort faced only by publishers also properly construes the policy as a whole, because it takes into account the AISLIC policy's status as a media liability policy with limited coverage provisions. *Bank of the W.*, 4 Cal. 4th at 1265. And whereas a broader reading of the term would disregard the other "wrongful acts" listed in the policy,[4] defining negligent publi-

---

[4]For example, the district court relied on *Newcombe* to hold that "negligent publication" referred to "that category of tort claims typified by defamation and misappropriation," *Sony Comp. Entm't*, 2005 U.S. Dist. LEXIS 30424, at *14, but the AISLIC policy defines defamation and misappropriation as separate wrongful acts in coverage provisions (a) and (c).

cation as a cause of action in which a plaintiff alleges that a defendant's publication led to harmful conduct does not overlap with any of the other "wrongful acts." *See Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 503 (2005) (disfavoring constructions of contractual provisions that would render other provisions surplusage).

**[5]** In sum, we hold that the term "negligent publication" in the AISLIC policy refers to a very narrow tort in which the publication of material encourages or instructs readers to engage in harmful conduct. We reject Sony's expansive definition as inconsistent with the context of the policy as a whole and unsupported by the case law. Sony, a sophisticated purchaser, clearly could have purchased coverage for product defects or false advertising — indeed, Sony previously held an insurance policy with AISLIC that covered "any error or omission, misstatement, misleading statement or misinterpretation" — yet the policy at issue in this lawsuit did not include such coverage. Sony's attempt to expand the meaning of "negligent publication" to cover all negligent communications with the public fails.

### ii. *The* Kim/Kaen *suits do not allege "negligent publication"*

**[6]** To determine whether the *Kim/Kaen* lawsuits alleged claims of "negligent publication," we must compare the allegations of the complaints with the coverage language of the policy. *Palmer*, 21 Cal. 4th at 1115-16 ("If a claim does not fall within the terms of [the coverage] clauses, then no coverage exists."). The *Kim/Kaen* lawsuits alleged claims for false advertising, negligent misrepresentation, breach of warranty, and other claims based on fraud. They did not allege that Sony published material that led readers to engage in a harmful act, nor did they allege that Sony engaged in any actions typified by the body of case law discussing "negligent publication."

**[7]** Therefore, we hold that AISLIC does not have an obligation to indemnify or provide any defense costs for Sony in the *Kim/Kaen* suits under the "negligent publication" coverage provision of the policy. Sony does not allege coverage under any other wrongful act, thus no affirmative coverage provision in the AISLIC policy requires AISLIC to insure Sony with respect to the class action suits.

*2.   Exclusion P does not create an independent duty to defend*

Sony argues that even if the Panel does not agree that AISLIC must indemnify Sony or pay its defense costs under the coverage provisions, AISLIC nonetheless has a duty to defend Sony under the exception language in Exclusion P. Exclusion P disallows coverage for claims "arising out of false advertising or misrepresentation in advertising" but goes on to state: "However, we will defend suits alleging any of the foregoing conduct until there is a judgment, final adjudication, adverse admission or finding of fact against [Sony]."

**[8]** The district court properly held that Exclusion P cannot establish coverage that does not exist under the affirmative coverage provisions. While an insurer's duty to defend is broad in scope, *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 289, 295 (1993), proper coverage analysis begins by considering whether the policy's insuring agreements create coverage for the disputed claim. *See Stanford Ranch, Inc. v. Md. Cas. Co.*, 89 F.3d 618, 627 (9th Cir. 1996). If coverage exists, then the court considers whether any exclusions apply. If coverage does not exist, the inquiry ends. The exclusions are no longer part of the analysis because "they cannot expand the basic coverage granted in the insuring agreement." *Id.*

**[9]** The rule is no different for exceptions to exclusions. A "carve back" within an exclusionary provision merely restores already-existing coverage. "[T]here is no cure for a lack of coverage under the insuring clause. Even if the effect of an

exception is to render a particular exclusion inoperative, the insured must still prove the loss is covered." *Old Republic*, 66 Cal. App. 4th at 145.[5]

Sony argues that a ruling for AISLIC on this issue would render the defense exception to Exclusion P meaningless, because if AISLIC has no duty to defend false advertising claims, then the carve-back for defense has no purpose. This is not necessarily the case. As AISLIC points out, the defense exception could apply to claims that allege false advertising in conjunction with a covered wrongful act, such as wrongful act (c), infringement of copyright or trade dress. *See*, *e.g.*, *Cooper Industries*, *Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 428 (2001) (plaintiff alleged false advertising in conjunction with infringement of trade dress); *Herman Miller, Inc. v. Palazzetti Imports and Exports*, *Inc.*, 270 F.3d 298, 306 (6th Cir. 2001) (same). In such a situation, AISLIC would indemnify the policyholder and provide certain defense costs with respect to the trade dress claim,[6] but only defend the insured with respect to the false advertising claim.

---

[5]Sony vigorously argues that coverage provisions can and do appear in exclusions to policy coverage. The cases it cites fail to prove its point. *See*, *e.g.*, *Aydin v. First State Ins. Co.*, 18 Cal. 4th 1183, 1191-92 (1998) (exception to a pollution exclusion was properly construed as a coverage provision, but only for the purpose of allocating the burden of proof on the insured); *Marie Y. v. Gen. Star Indem. Co.*, 110 Cal. App. 4th 928, 959-60 (Ct. App. 2003) (exception to exclusion clause supported duty to defend where coverage otherwise existed); *TRB Investments*, *Inc. v. Fireman's Fund Ins. Co.*, 40 Cal. 4th 19, 22-23 (2006) ("under construction" exception to "vacancy" exclusion did not create coverage but merely restored coverage that exclusion took away); *Nat'l Union Fire Ins. Co. v. Lynette C.*, 228 Cal. App. 3d 1073, 1080 (Ct. App. 1991) (insured properly read the exception to the exclusion "in light of the basic coverage clause").

[6]Recall that the AISLIC policy did not lay out a clear "duty to defend" lawsuits alleging covered acts. Rather, it had a "right but not a duty to defend" such suits, but promised to pay a varying portion of Sony's defense costs in excess of Sony's deductible depending on whether Sony chose its own lawyer or used AISLIC's counsel.

**[10]** In light of the above, we hold that because there is no coverage under the insuring provisions of the AISLIC Policy, there is no coverage under the carve-out for defense of false advertising within Exclusion P. Therefore, we affirm the district court's grant of summary judgment on the issues of AISLIC's duties to indemnify and defend Sony. AISLIC did not engage in bad faith when it refused coverage because coverage did not exist, thus summary judgment on that claim was also appropriate. *See Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1152-53 (Ct. App. 1990).

*D. American Home Had No Duty to Defend or Indemnify Sony*

The American Home policy provided that American Home had a duty to indemnify and defend Sony against any lawsuit seeking bodily injury or property damage. Property damage was defined to include "physical injury to tangible property" as well as "loss of use of tangible property that is not physically injured." However, the policy excluded coverage for property damage to Sony's own product (Exclusion (k)), as well as coverage for "impaired property or property not physically injured" arising out of "a defect, deficiency, inadequacy, or dangerous condition in '[Sony's] product' " (Exclusion (m)). The impaired property exclusion had an exception for "the loss of use of other property arising out of sudden and accidental physical injury" to Sony's product after it was put to its intended use.

Sony argues that the *Kim/Kaen* suits allege both "loss of use of tangible property," and "physical injury to property," therefore the district court erred when it granted summary judgment in favor of American Home on the duty to defend and indemnity claims. We disagree. While an insurer must defend any claim potentially covered by a policy, *Montrose Chem. Corp.*, 6 Cal. 4th at 295, Sony has not proven potential coverage of the *Kim/Kaen* claims under the American Home policy.

*1. Loss of use claims*

**[11]** The *Kim/Kaen* complaints did not allege that the defects in the PlayStation 2 caused them to experience a loss of use of game discs or DVDs. Nonetheless, Sony argues that the *Kim/Kaen* plaintiffs asserted "classic 'loss of use' " claims covered by the American Home policy. Sony cites to allegations that the PlayStation 2 was unable to read or play CDs, DVDs, or original PlayStation games, and complaints of discs skipping and freezing, accompanied by banging or clicking noises.

**[12]** These allegations are far from "classic 'loss of use' " claims. As the district court noted, the statements regarding discs freezing and skipping referenced the defects in the PlayStation 2, not defects in the discs themselves. *Sony Comp. Entm't*, No. C 04-0492 PJH, at 6 (N.D. Cal. Aug. 30, 2005). Indeed, though it is undisputed that certain discs did not properly play on the PlayStation 2, the complaints never suggested that the discs themselves did not function properly on other devices. *Id.* In this respect, the suit is easily distinguishable from the loss of use cases Sony cites, in which the insured's defective property rendered the property of a third party unusable. *See Anthem Elecs.*, *Inc. v. Pac. Employers Ins. Co.*, 302 F.3d 1049, 1057 (9th Cir. 2002) (defective circuit boards inserted into scanners of third party plaintiff rendered scanners unusable); *Hendrickson v. Zurich American Ins. Co.*, 72 Cal. App. 4th 1084, 1091-92 (Ct. App. 1999) (defective strawberry plants planted in fields caused loss of use of fields).[7] Moreover, the *Kim/Kaen* plaintiffs did not allege any recognized measure of loss of use of discs, such as rental value. *See, e.g.*, *F&H Constr. v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364, 377 (Ct. App. 2004). Last, Sony's citation to the *Kim/Kaen* settlement agreement, which references "loss of

---

[7]Sony's citation to *Park Univ. Enter. v. American Cas. Co.*, 442 F.3d 1239, 1244-45 (10th Cir. 2006) is also unhelpful because the loss of use in that case was not disputed.

use" of discs, is irrelevant, because the duty to defend is based on the complaints and facts known to the insurer at the time of tender only. *We Do Graphics*, *Inc. v. Mercury Cas. Co.*, 124 Cal. App. 4th 131, 136 (Ct. App. 2004) ("The duty to defend is not measured by hindsight, but turns 'upon those facts known by the insurer at the inception of a third party lawsuit.' ") (citing *Montrose*, 6 Cal. 4th at 295).

**[13]** Even if Sony could establish coverage for the *Kim/ Kaen* suits under the loss of use provision, the lawsuits fall squarely within the purview of Exclusion (m). That provision excludes coverage for "loss of use" property damage arising out of "a defect, deficiency, inadequacy, or dangerous condition in '[Sony's] product.' " Any loss of use of the discs inserted into the PlayStation 2 is the result of a defect in Sony's product, and is therefore excluded from coverage under Exclusion (m). *See America Online*, *Inc. v. St. Paul Mercury Ins. Co.*, 347 F.3d 89, 98-99 (4th Cir. 2003) (loss of use coverage barred by similar exclusionary provision).

Sony's only response to the Exclusion (m) argument is that the "sudden and accidental" physical injury exception to the exclusion applies. Sony unconvincingly contends that because the complaints allege that the freezing and locking of the discs can happen at any time and that the defects in the console generally manifest at certain time periods, the allegations "evince[ ] the possibility that the loss of use of discs resulted from a sudden and accidental physical injury to the PlayStation 2s." But these allegations provide far more support for the theory that the devices deteriorated over time than that each and every class member's devices experienced a sudden and accidental physical injury. Sony analogizes to *Anthem*, in which this court held that the insured presented a possibility that a similar "sudden and accidental physical injury" exception to an exclusion applied, but in that case extrinsic evidence in the form of diagnostic reports suggested that

physical damage had occurred to the insured's product. Here, no such evidence exists. *Anthem*, 302 F.3d at 1059-60.[8]

[14] Accordingly, we hold that the *Kim/Kaen* lawsuits are not covered under the "loss of use" coverage provision, and that, even if they were, they are excluded from coverage under Exclusion (m). The sudden and accidental injury exception to Exclusion (m) is inapplicable.

### 2. *Physical damage claims*

[15] The *Kim/Kaen* complaints themselves did not allege any property damage to discs. In fact, in depositions, all three class representatives specifically denied any claims of physical injury to discs inserted into the PlayStation 2. Further, none of the customer statements in the original complaint or motions for class certification or jury trial referenced scratched or damaged discs.

Despite the lack of reference to property damages in the lawsuit, Sony argues that the *Kim/Kaen* complaint potentially includes claims of physical damage to discs inserted into the PlayStation 2. It argues that merely because class plaintiffs did not suffer physical injury to the discs does not mean the class could not have recovered on such a theory, and that Sony's retender of the *Kim/Kaen* complaint to American Home in October 2003 was accompanied by evidence of customer complaints of physical injury to discs and/or games.[9]

---

[8]Sony also argues that the district court improperly placed the burden on Sony to establish that the "sudden and accidental" exception applies. While the district court cited a case dealing with an indemnity provision rather than a duty to defend provision, *see Aydin*, 18 Cal. 4th at 1188, Sony still bears the initial burden of proving that there is a possibility that the exception to the exclusion applies. *See Anthem*, 302 F.3d at 1059 & n.3.

[9]The customer complaints are properly part of the duty to defend analysis because they were known to American Home at the time of tender. *Montrose*, 6 Cal. 4th at 295.

**[16]** We find these arguments unpersuasive. Though the duty to defend is broad, "the insured may not speculate about unpled third party claims to manufacture coverage." *Hurley Construction Co. v. State Farm Fire & Cas. Co.*, 10 Cal. App. 4th 533, 538 (Ct. App. 1992). California courts have held that no duty to defend attaches where, as here, the third party complaint did not allege the type of damages covered by the policy, and the class representatives explicitly disavowed any interest in the type of damages covered by the policy. *See Low v. Golden Eagle Ins. Co.*, 99 Cal. App. 4th 109, 113-14 (Ct. App. 2002) (no duty to defend where "the . . . complaint is . . . couched overwhelmingly in class action terms, but the named plaintiff expressly disclaims any interest in seeking recovery of damages for [the type of damages] . . . required to trigger coverage and a related duty to defend under the policy"); *see also The Upper Deck Co. v. Federal Ins. Co.*, 358 F.3d 608, 615 (9th Cir. 2004) ("Upper Deck asked us to remember that the underlying suit is a class action and that, even if the named plaintiffs did not suffer bodily injury, members of the class could have suffered bodily injury. This argument contradicts the complaint itself, which states [that the named class plaintiffs are typical of the class as a whole.]"). Moreover, the customer complaints of scratches and other damage to discs — which could potentially establish physical damage — were never incorporated into the third party lawsuit. *Gunderson v. Fire Ins. Exch.*, 37 Cal. App. 4th 1106, 1116 (Ct. App. 1995) (no duty to defend where "none of the allegations concerning damage to the fence [which could have been covered under the policy] . . . were *ever* incorporated in [the] complaint against appellants") (emphasis in original). Further, American Home need not rely on the assertions of Sony's own counsel about potential covered claims in determining whether it has a duty to defend. *Hurley*, 10 Cal. App. 4th at 538.

**[17]** Accordingly, we affirm the district court's summary judgment in favor of American Home on the duty to defend issue. Sony has not established the potential for coverage either under the loss of use or physical damage provisions of

the policy. Sony's indemnification claim fails as well for the duty to defend is broader than the duty to indemnify. *Montrose*, 6 Cal. 4th at 295. The bad faith claim against American Home is similarly rejected because if there is no coverage, there can be no bad faith in refusing coverage. *Love*, 221 Cal. App. 3d at 1153.

### III.   CONCLUSION

We AFFIRM the district court.

---

BYBEE, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that American Home Assurance Company had no duty to indemnify or defend Sony Computer Entertainment America, Inc. ("Sony"). I thus concur in Section II.D of the majority opinion. I also agree that American International Specialty Lines Insurance Company ("AISLIC") had no duty to indemnify Sony. For the reasons I explain below, however, I disagree with the majority's conclusion that AISLIC had no duty to defend Sony. I respectfully dissent from that portion of Section II.C of the majority opinion.

### I

Like the majority, I begin my analysis by examining the policy's coverage clauses; if a claim does not fall within those clauses, no coverage exists. *Palmer v. Truck Ins. Exch.,* 21 Cal. 4th 1109, 1115-16 (1999). The insurance policy between Sony and AISLIC provided that AISLIC would indemnify Sony for damages resulting from any claim for "a wrongful act" in Sony's business. The policy defined the term "wrongful act" by listing a number of actions including "negligent publication." Therefore, I agree with the majority that "the question of whether AISLIC's policy covers Sony turns on

whether the *Kim/Kaen* lawsuits assert claims within the meaning of [negligent publication].” Maj. Op. 8759.

A

In interpreting the phrase[1] “negligent publication,” under California law courts must give effect to the mutual intention of the parties. *See MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003). The parties’ intent, in turn, is inferred solely from the written provisions of the contract. *Id.* The words in an insurance contract are to be “interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage.” *Id.* at 648 (internal quotation marks omitted). Furthermore, “insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured.” *Id.* (internal quotation marks omitted). The majority and I are in agreement on these principles of California insurance contract interpretation. It is in their application that our disagreement arises.

AISLIC does not contend that the parties gave the phrase “negligent publication” a technical or special meaning. Accordingly, the words “negligent publication” are to be “interpreted in their ordinary and popular sense.” *Id.* at 648 (internal quotation marks omitted).

Sony contends that the ordinary and popular meaning of the phrase “negligent publication” can be determined by combining the dictionary definitions of the individual words in the two-word phrase. I agree. When a layperson encounters an

---

[1]The majority refers to “negligent publication” as a “term.” I believe that “phrase” is more appropriate and therefore refer to it as such. Although this may seem like mere semantics, my disagreement with the majority turns on the fact that the majority believes that “negligent publication” must be a single term with a single definition, whereas I believe that “negligent publication” is not a single term at all, but a phrase made up of two individual words that have meaning both individually and in combination.

unknown phrase, absent a technical or special meaning, that layperson interprets the phrase by combining the meanings of the individual words comprising that phrase. In this case, a layperson would understand that "negligent publication" would simply refer to a publication distributed negligently. "In seeking to ascertain the ordinary sense of words [in an insurance policy], courts in insurance cases regularly turn to general dictionaries." *Scott v. Cont'l Ins. Co.*, 51 Cal. Rptr. 2d 566, 569 (Ct. App. 1996). Turning to the dictionary, the word "negligent" means "lacking or exhibiting a lack of due care or concern." WEBSTER'S II NEW COLLEGE DICTIONARY 732 (1999). The word "publication" means "communication of information to the public." *Id*. at 895. Given the ordinary meaning of those words, a layperson might properly understand that the phrase "negligent publication" means something like "communication of information to the public lacking or exhibiting a lack of due care or concern."

B

Applying this definition of "negligent publication," the *Kim/Kaen* lawsuits assert claims — namely, false advertising and negligent publication — within the meaning of "negligent publication." The majority concedes as much. Maj. Op. 8759. The *Kim* complaint claims that Sony's "press releases and advertisements have not and do not disclose the defect or the viewing or software compatibility problems described in this Complaint." The *Kim* complaint clearly complains about Sony's press releases and advertising, that is, its communication of information to the public. Furthermore, by alleging that those communications fail to disclose certain defects, the *Kim* complaint can be understood to contend that Sony's communications were "negligent" or "exhibit[ed] a lack of due care or concern." Similarly, the *Kaen* complaint claims that Sony issued advertisements that were "untrue, misleading, and likely to deceive the public." Unless there was an applicable exclusion, the affirmative provisions of the insurance con-

tract provided coverage for the *Kim/Kaen* claims, and AISLIC had a duty to indemnify Sony.

## II

The majority comes to a contrary conclusion. It does not contend that "negligent publication" has a technical or special meaning. On the contrary, the majority acknowledges that "[b]ecause there is no evidence that the parties intended the term to carry a technical meaning, the ordinary and popular meaning of the term governs." Maj. Op. 8759. The majority, however, rejects the dictionary-derived meaning of "negligent publication," because it believes that this meaning would be inconsistent with the context of the insurance policy as a whole, and because it finds no judicial case using the phrase in precisely this way.

## A

The majority argues that we should not apply the dictionary definition of the phrase "negligent publication" because it is inconsistent with the context of the AISLIC policy as a whole. Maj. Op. 8760. I agree with the majority that the "meanings of a word as found in a dictionary cannot be inserted into the text of an insurance policy without regard to the document construed as a whole." *Scott*, 51 Cal. Rptr. 2d at 569 n.4. The majority argues that the placement of the phrase negligent publication in the list "defective advice, incitement, and negligent publication" tends to supports the majority's interpretation that the term refers to a narrow tort somehow relating to "defective advice and incitement." Maj. Op. 8761. Similarly, the majority suggests that the fact that this is a media policy cuts against the plain and ordinary meaning of the phrase. Maj. Op. 8762.

Other indications in the policy, however, support Sony's interpretation of "negligent publication," in particular, Exclusion P. Exclusion P disallows indemnity coverage for claims

"arising out of false advertising or misrepresentation in advertising" but goes on to carve back a duty to defend in those cases. Although I agree that an exclusion cannot expand coverage that does not exist under the affirmative coverage provisions, *see Stanford Ranch, Inc. v. Md. Cas. Co.* 89 F.3d 618, 627 (9th Cir. 1996), it "can help to resolve an ambiguity in an insuring clause in favor of coverage." *Am. Alternative Ins. Corp. v. Super. Ct.*, 37 Cal. Rptr. 3d. 918, 924 n.2 (Ct. App. 2006). "Unquestionably, it may be considered part of the general circumstances impacting an insured's objectively reasonable expectations as to the scope and extent of coverage under a policy." *Id.* Exclusion P provides contextual evidence for the phrase "negligent publication" within the affirmative coverage section of the AISLIC policy. If there was no affirmative coverage for false advertising or misrepresentation in advertising then the policy would have no need for an exclusion specifying that those claims were not covered. Why recite that certain acts are expressly excluded from the policy if they were never covered in the first place? The majority's interpretation leaves Exclusion P meaningless. At best, the context of the policy sends mixed signals. In light of this ambiguity, I would apply the plain meaning of the words and construe the insurance policy in favor of the insured. *See Bank of the W. v. Super. Ct.*, 2 Cal. 4th 1254, 1265 (1992) (insurance policies are construed against the insurer if the meaning of a term is ambiguous in light of the policy as a whole).

B

The majority also finds the dictionary definition of "negligent publication" unpersuasive because it is not supported by the case law. Maj. Op. 8762. I fear that in the course of implementing the common law system, we have become so adept at looking to judicial cases to obtain the solutions to the challenges we encounter, that we have come to believe that even when determining the ordinary and popular meaning of words, the solution is to be found in case law. The California

Supreme Court has admonished that absent evidence that the parties intended the provision to have a specialized meaning that a term must be construed as would a layperson, and not as it might be analyzed by an attorney or an insurance expert, or, I might add, a judge. *See E.M.M.I. Inc., v. Zurich Am. Ins. Co.,* 84 P.3d 385, 390 (Cal. 2004). I am quite certain that a layperson looks to a dictionary to determine the meaning of a phrase, not to case law.

The consequences of the majority's methodology would surely befuddle a layman. On the one hand, the majority finds that the term "negligent publication" cannot encompass the definition that Sony proposes because none of the cases "use the term as broadly as Sony does." Maj. Op. 8762. On the other hand, the majority acknowledges that "the cases do not yield one clear definition of 'negligent publication.' " Maj. Op. 8762. The very fact, however, that courts across the country have applied the phrase "negligent publication" liberally and loosely to a broad variety of claims and theories of recovery is evidence that each of those courts is individually applying the plain meaning of the phrase. If the phrase does not have a consistent meaning, cited by the majority, then why prefer the cases over the dictionary?

The only commonality in the "variety of cases" cited by the majority involving the phrase "negligent publication" is that all of them use a definition that is consistent with the ordinary or popular meaning of the words. That is, they all involve the publication of something in a negligent matter. Although it is true that none of the cases encompass Sony's proffered definition, I am puzzled as to why cases that "do not yield one clear definition of 'negligent publication' " should be seen as a "limited set." Maj. Op. 8762. If the first court to use the phrase had been deemed to have created a closed set, then none of the subsequent cases could have created separate definitions. I am unaware that Sony missed any secret deadline after which a term may no longer be used in new judicial contexts, and the possible usages for the term is closed to the con-

junction of the ways in which it had thus far been used. Absent such a deadline, I would do what every court to have used the phrase "negligent publication" has done, and I would look to the plain meaning of the words to determine their meaning. That plain meaning is better determined by looking in a dictionary than in court cases.

### III

Having concluded that the policy's affirmative insuring agreements create coverage for Sony's disputed claim, I next turn to the exclusions, to determine whether coverage has been otherwise excluded. *See Stanford Ranch*, 89 F.3d at 627. Exclusion P of the policy disallows coverage for claims "arising out of false advertising or misrepresentation in advertising." This language removes Sony's claim from the coverage granted it by the "negligent publication" provision. Exclusion P, however, then states: "[h]owever, we will defend suits alleging any of the foregoing conduct until there is a judgment, final adjudication, adverse admission or finding of fact against [Sony]." Although Exclusion P excludes indemnity coverage of Sony's claim, it affirms a duty to defend. Consequently, I would conclude that AISLIC had a duty to defend Sony's claims and would reverse that portion of the district court's judgment.