Filed 8/30/13  Liberty Mutual Fire In. Co. v. Central  Garden and Pet Co. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, | |
| Plaintiff and Respondent, | A131482 |
| v. | |
| CENTRAL GARDEN AND PET COMPANY et al., | (City & County of San Francisco Super. Ct. No. CGC-09-493845) |
| Defendants and Appellants. | |

This appeal involves an insurance coverage dispute arising out of an insured's sale of an inventory of pet birds allegedly exposed to an infectious disease.  The trial court granted summary judgment for the insurer after concluding it had no duty to defend its insured in a lawsuit filed by the company that purchased the bird inventory.  Because the "your product" exclusion in the insurance policy precludes coverage for "property damage" to the bird inventory, we shall affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The action below is a declaratory relief lawsuit filed by plaintiff and respondent Liberty Mutual Fire Insurance Company (Liberty Mutual) against plaintiffs and appellants Central Garden and Pet Company, Kaytee Products, Inc., and Pets International, Ltd. (collectively Central Garden).  Liberty Mutual sought a declaration that it was not obligated to defend or indemnify its insured, Central Garden, in connection with claims made against the insured in a federal court action filed in Texas (*Perfect*

1

*Birds, LLC v. Kaytee Products, Inc. et al.* (Feb. 11, 2007, W08CA042) [nonpub. order]) (the *Perfect Birds* lawsuit).

### The Perfect Birds lawsuit

Before December 2007, a subsidiary of Central Garden operated a live pet bird sales business through its "Preferred Birds" division. The primary customer of the Preferred Birds division was PetSmart, a national chain of pet stores. The Preferred Birds division supplied birds to approximately 789 PetSmart stores nationwide.

Rainbow Exotics, Inc. (Rainbow Exotics) was the main competitor of Preferred Birds. In late November 2007, Jack Graham, the owner of Rainbow Exotics, agreed to purchase the business assets of Preferred Birds through a newly formed company, Perfect Birds, LLC (Perfect Birds). The assets consisted primarily of an inventory of live pet birds intended for resale to pet stores such as PetSmart. Following the asset sale, tests of birds at PetSmart stores supplied by Perfect Birds showed some positive tests for exposure to psittacosis, an infectious bird disease. PetSmart announced it was quarantining all birds in its stores and would suspend purchases of birds from Perfect Birds. PetSmart allegedly refused to buy any birds from Perfect Birds until June 2008, and stopped buying one type of bird—cockatiels—altogether. Further, the state of Florida announced it was placing a quarantine on a facility in Florida that Perfect Birds had purchased from Central Garden. The state's quarantine remained in place for one month.

On February 11, 2008, Perfect Birds filed suit against Central Garden in federal district court in Texas. The original complaint in the *Perfect Birds* lawsuit contained causes of action for breach of contract, breach of implied warranty, and fraudulent misrepresentation. Perfect Birds alleged that Central Garden was placed on notice as of November 12, 2007—before the asset sale to Perfect Birds was finalized—that birds delivered by Central Garden to multiple pet stores throughout the country had tested positive for exposure to psittacosis. In the breach of contract cause of action, Perfect Birds alleged that, "[a]s a direct result of [Central Garden's] failing to take steps which were reasonable and customary in the industry to prevent the exposure of the [birds] . . .

2

from being exposed or potentially exposed to a disease, [Perfect Birds] has been prevented from selling any pet birds to its major purchaser(s) since December 13, 2007." As support for the breach of implied warranty cause of action, Perfect Birds alleged that the pet birds sold by Central Garden were not "fit for the ordinary purposes for which goods of that description are used" in light of the positive tests indicating exposure to disease in November 2007. The fraud cause of action was supported by an allegation that Central Garden had failed to disclose that birds it supplied to pet stores had tested positive for exposure to psittacosis before the asset sale to Perfect Birds was finalized.

Perfect Birds alleged it suffered damages because it was prevented from selling pet birds to its primary customer during the period of the quarantine. In addition, Perfect Birds allegedly incurred "substantial additional damages" in the form of "loss of marketable inventory due to the age and lifespan of the pet birds, which [Perfect Birds] has been prevented from selling in the regular course of its business; costs incurred as a result of governmentally required health measures; the purchase of additional personal protective equipment to be utilized by [Perfect Birds'] employees; veterinary expenses; the acquisition of additional facilities and equipment to accommodate a reproducing, live inventory which is not being sold; legal fees; and interest on debt incurred to continue [Perfect Birds'] existence."

Central Garden settled the *Perfect Birds* lawsuit in September 2009. Under the terms of the settlement, Central Garden agreed to pay Perfect Birds $946,308.92. At the time of the settlement, the only remaining cause of action in the *Perfect Birds* lawsuit was a fraudulent inducement cause of action after the federal district court dismissed the other causes of action in a ruling on a summary judgment motion.

### The Liberty Mutual policy

Liberty Mutual issued a commercial general liability insurance policy to Central Garden with a policy period of June 28, 2007, to June 28, 2008. The policy has a per occurrence limit of $1 million, subject to a $250,000 deductible. In the policy's insuring agreement, Liberty Mutual agreed to "[p]ay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance

3

applies." "Property damage" is defined in the policy as either "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." In order to be covered under the policy, "property damage" must be caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The Liberty Mutual policy contains an exclusion from coverage for " 'property damage' to 'your product' arising out of it or any part of it." For purposes of the exclusion, "your product" is defined in relevant part to include "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured. The policy also contains an exclusion from coverage for property owned by the insured.

### *Tender of Perfect Birds lawsuit to Liberty Mutual*

In January 2008, Central Garden made an insurance claim to Liberty Mutual concerning potential liability arising from the asset sale to Perfect Birds. In the claim form submitted to Liberty Mutual, the covered "occurrence" was described as: "product liability—birds may have infected other birds." By letter dated February 7, 2008, Liberty Mutual denied coverage and called Central Garden's attention to exclusions in the policy for property damage to "property you own" and "your product." Liberty Mutual stated: " 'Property damage' to the birds in question is excluded. Since the only physical injury alleged is to your tangible property (the birds), the claim is excluded. Our coverage would apply only to 'property damage' to other tangible property." Liberty Mutual also stated that any "loss of business or loss of revenue" would be an uncovered "economic loss."

By letter dated March 11, 2008, an attorney for Central Garden responded to Liberty Mutual's denial of coverage and provided Liberty Mutual with a copy of the original complaint in the *Perfect Birds* lawsuit. In its letter, Central Garden's counsel stated that, before December 2007, PetSmart had purchased birds from two suppliers— Central Garden (through the Preferred Birds division of one of its subsidiaries) and

4

Rainbow Exotics.  Central Garden supplied birds to approximately 789 PetSmart stores while Rainbow Exotics supplied birds to approximately 220 PetSmart stores. According to the letter, Central Garden sold all of the assets of its bird distribution business to Perfect Birds, which was described by counsel as a "subsidiary" of Rainbow Exotics. Central Garden's attorney further stated that "[t]he claim had its genesis on November 9, 2007, when 6 cockatiels in one PetSmart store tested positive for psittacosis."  The birds in that store had been supplied by Central Garden.  Nothing further was heard about the matter until late December 2007, when PetSmart announced it would quarantine all stores that had originally been supplied by "Rainbow Exotics/Perfect Birds."  By that time, Central Garden had sold its bird inventory to Perfect Birds.

Central Garden's attorney took the position that the *Perfect Birds* lawsuit alleged property damage under the policy because of the physical injury to birds that tested positive for psittacosis as well as the loss of use of those birds that could not be sold during the quarantine.  Counsel also argued that the "your product" exclusion was inapplicable because all of the birds in Perfect Birds' inventory as of the time PetSmart instituted the quarantine belonged to Perfect Birds and not Central Garden.

In further correspondence, the attorneys for Central Garden and Liberty Mutual continued to dispute the applicability of the "your product" exclusion.  Liberty Mutual's counsel pointed out that the language of the exclusion contemplates a sale of the insured's products to a third party.  Liberty Mutual also sought clarification as to which birds PetSmart was refusing to buy and which birds were subject to a quarantine by the state of Florida.  The focus of these inquiries was on whether any of the damages allegedly incurred by Perfect Birds related to birds other than the bird inventory sold to Perfect Birds by Central Garden.  In a letter dated June 13, 2008, counsel for Central Garden responded that PetSmart suspended sales in *all* of its stores, including those supplied by Rainbow Exotics.  Counsel further clarified that the birds involved in the quarantine by the state of Florida were part of the asset sale from Central Garden to Perfect Birds.

By letter dated September 8, 2008, counsel for Liberty Mutual stated that, "[a]lthough it appears that the claims Perfect Birds has asserted against [Central Garden] are not covered under the terms of the Liberty Mutual policy, Liberty Mutual has elected to participate in the defense, subject to a full and complete reservation of rights."[1] In the letter, counsel referred to the representation by Central Garden that Perfect Birds is a subsidiary of Rainbow Exotics, which purportedly also suffered damages as a result of the PetSmart quarantine. Counsel stated that Liberty Mutual's preliminary investigation indicated that the representation about the relationship between the two business entities was inaccurate, citing to discovery responses in the *Perfect Birds* lawsuit establishing that Rainbow Exotics and Perfect Birds are wholly separate companies. Counsel asked for clarification as to whether any losses purportedly suffered by Rainbow Exotics were encompassed within the *Perfect Birds* lawsuit.

Central Garden's attorney responded by letter dated December 4, 2008. Counsel clarified that "Liberty Mutual appears to be correct that Perfect Birds is not authorized to assert a claim on behalf of Rainbow Exotics with respect to" the birds Rainbow Exotics was unable to sell. Thus, Central Garden was "not contending at this time that Rainbow Exotics' potential claim with respect to the birds that Rainbow Exotics supplied to approximately 220 PetSmart stores are part of the damages claimed by Perfect Birds in its lawsuit." Nevertheless, counsel still asserted that the "your product" exclusion does not apply, reasoning that live animals are not products for purposes of the exclusion. In a March 2009 response, counsel for Liberty Mutual wrote: "Given the recent confirmation that there were no claims based on the 220 stores Rainbow Exotics supplied, it appears that the exclusion for property damage to your product applies to preclude coverage . . . ."

---

[1] Counsel for Liberty Mutual clarified that the terms of the policy did not impose an immediate obligation to fund the defense but instead required Central Garden to "front defense fees and expenses" subject to reimbursement by Liberty Mutual in proportion to the amount of any covered damages.

*Liberty Mutual's declaratory relief lawsuit*

Liberty Mutual filed the declaratory relief action giving rise to this appeal in October 2009. Liberty Mutual sought a declaration that it was not obligated to defend or indemnify Central Garden in connection with the *Perfect Birds* lawsuit. Central Garden answered the complaint and filed a cross-complaint in which it asserted causes of action for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. Among other things, Central Garden alleged Liberty Mutual had not paid (1) any portion of Central Garden's fees and costs incurred in defending the *Perfect Birds* lawsuit, or (2) any portion of the settlement with Perfect Birds. According to Central Garden, it incurred $402,853.04 in defense costs after tendering its defense of the *Perfect Birds* lawsuit to Liberty Mutual.

Liberty Mutual filed a motion for summary judgment on the ground it did not owe Central Garden a defense or indemnification with respect to the *Perfect Birds* lawsuit. Liberty Mutual argued it was entitled to judgment as a matter of law because (1) the policy's "occurrence" requirement was not satisfied, (2) the *Perfect Birds* lawsuit did not allege "property damage" but instead involved "economic losses flowing from a business transaction," and (3) "property damage" to "your product" was excluded from coverage. Central Garden filed a cross-motion for summary adjudication on the ground Liberty Mutual had a duty to defend it against the *Perfect Birds* lawsuit. Central Garden sought recovery of its defense costs and also sought an adjudication that, as a consequence of the breach of the duty to defend, Liberty Mutual was required to reimburse it for the amount paid to settle the *Perfect Birds* lawsuit, less the $250,000 deductible. Liberty Mutual and Central Garden agreed to a set of stipulated facts as support for the cross-motions.

The trial court granted Liberty's Mutual's summary judgment motion and denied Central Garden's cross-motion for summary adjudication. In the order granting summary judgment, the court concluded that "Perfect Birds' lawsuit was based on purposeful business conduct that did not satisfy the policy's 'occurrence' (i.e., 'accident') requirement." Following entry of judgment in favor of Liberty Mutual, Central Garden filed a timely appeal.

DISCUSSION

**1.** *Standard of review*

A court properly grants summary judgment if the record establishes no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review an order granting a summary judgment motion de novo. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) The interpretation and application of an insurance policy to undisputed facts presents a question of law subject to this court's independent review. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*) [whether policy gives rise to duty to defend is question of law].)

We review the trial court's rulings and not its reasoning. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336.) "Thus, a reviewing court may affirm a trial court's decision granting summary judgment for an erroneous reason." (*Ibid.*; accord, *Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376.)

**2.** *Legal principles governing the duty to defend*

" '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] . . . "[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded.' " (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 (*Montrose*).)

"[T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." (*Waller, supra,* 11 Cal.4th at p. 19; see also *Montrose, supra,* 6 Cal.4th at p. 295.) "Conversely, where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the

8

bare allegations in the complaint suggest potential liability.  [Citations.]  This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy." (*Waller, supra,* at p. 19.)  "The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . ." (*Montrose, supra,* 6 Cal.4th at p. 295.)  The absence of a duty to defend is established when the insurer demonstrates that "the underlying claim cannot come within the policy coverage by virtue of the scope of the insuring clause or the breadth of an exclusion." (*Id.* at p. 301.)

Insurance policies are generally interpreted in the same manner as any other contract.  (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.)  "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (*Ibid.*)  "The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller, supra,* 11 Cal.4th at p. 18.)  The mutual "intent of the parties is to be inferred, if possible, solely from the written provisions of the contract." (*Ibid.*)  "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.  [Citation.]  But language in a contract must be interpreted as whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Ibid.*)

**3.**    ***"Accident"***

The Liberty Mutual policy provides liability coverage for property damage caused by an "occurrence," which the policy defines as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The trial court concluded the accident requirement was not satisfied here because the *Perfect Birds* lawsuit "was based on purposeful conduct."  For the reasons that follow, we disagree with the trial court and conclude the *Perfect Birds* lawsuit potentially sought damages caused by an accident.

9

Our Supreme Court has defined the term "accident" in the context of liability insurance as " ' "an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause." ' " (*Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 308 (*Delgado*); accord, *Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.* (1959) 51 Cal.2d 558, 563-564 (*Geddes*); *Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553, 559 (*Hogan*).) An accident does not result from a deliberate act of the insured " 'unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage.' " (*Delgado, supra,* 47 Cal.4th at p. 315.)

In this case, Perfect Birds alleged that it suffered damage as a direct result of Central Garden's failure to take reasonable and customary precautions to prevent the bird inventory from being exposed to disease. In essence, Perfect Birds alleged the birds were unintentionally exposed to psittacosis as a result of Central Garden's negligence. This allegation satisfies the requirement of an "accident."

Liberty Mutual contends the *Perfect Birds* lawsuit alleged "purposeful acts and decisions that were part of a business transaction." It argues that the focus should be on the insured's deliberate conduct and not the "unanticipated consequences of purposeful conduct."

The sale of Central Garden's business assets was unquestionably a deliberate and intentional act. However, the mere fact Central Garden intended to sell its business assets to Perfect Birds does not rule out the possibility that the harm suffered by Perfect Birds resulted from an unintended consequence in the causal chain of events. (See *Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 273 [insured may carry out his intention and still cause unintended harm]; *Merced Mutual Ins. Co. v. Mendez* (1989) 213 Cal.App.3d 41, 50 [coverage not precluded simply because insured acted intentionally and victim was injured].) In *Delgado,* the Supreme Court cited the following example to explain that there may be an "accident" within the meaning of a liability insurance policy even though the causal chain of events included an intentional act of the insured: " 'When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be

10

an intentional act. However, the act directly responsible for the injury—hitting the other car—was not intended by the driver and was fortuitous. Accordingly, the occurrence resulting in injury would be deemed an accident.' " (*Delgado, supra,* 47 Cal.4th at p. 316.) In this case, although Central Garden intended to sell its business assets, there is no suggestion it intended to expose the birds to disease. It was the negligent exposure of the birds to disease that allegedly caused Perfect Birds to suffer damages.

Insofar as Liberty Mutual contends that coverage is precluded because any damages result from a contractual relationship, the Supreme Court has rejected the notion that losses pleaded as contractual damages are necessarily precluded from coverage under a commercial general liability policy. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 838.) The focus is not on the "fortuity of the form of action chosen by the injured party" but instead on the nature of the injury and the risk that caused the injury. (*Ibid.*)

The Supreme Court's decisions in *Geddes, supra,* 51 Cal.2d 558, and *Hogan, supra,* 3 Cal.3d 553, are instructive. In *Geddes,* the insured intentionally constructed and sold doors to a purchaser under a contract. (*Geddes, supra,* 51 Cal.2d at p. 561.) The purchaser sued the insured, alleging the doors were discovered to be defective after installation. (*Ibid.*) The court concluded the "door failures were unexpected, undesigned, and unforeseen," and were therefore an accident, even though the doors were intentionally constructed and deliberately sold pursuant to a contract. (*Id.* at p. 564.) In *Hogan,* a saw manufacturer sold a saw to a lumber company. (*Hogan, supra,* 3 Cal.3d at p. 557.) The lumber company sued the manufacturer after it discovered the saw cut the lumber too narrowly and its customers began rejecting the improperly cut lumber. (*Id.* at p. 558-559.) Even though the lumber company deliberately sold the saw to its customer, the court held the damages resulting from the undercutting resulted from a defect in the saw—an unforeseen and unexpected event. (*Id.* at p. 560.) This case is indistinguishable from *Geddes* and *Hogan.* Although Central Garden intended to sell its bird inventory to Perfect Birds, it did not intend to expose the birds to psittacosis.

One of Liberty Mutual's primary arguments rests on its characterization of the *Perfect Birds* lawsuit as a fraud action. Liberty Mutual correctly contends there is no

11

"accident" under a commercial general liability policy when an injured party's damages result from an insured's misrepresentations about the condition of property sold to the injured party. (See *Miller v. Western General Agency, Inc.* (1996) 41 Cal.App.4th 1144, 1150 [misrepresentations do not constitute accident regardless of whether they are intentional or negligent].) If the sole basis for the *Perfect Birds* lawsuit were that Central Garden misrepresented the condition of the birds its sold to Perfect Birds, we would be inclined to agree with Liberty Mutual that there is no potential for coverage. However, the *Perfect Birds* lawsuit also included an allegation indicating that Central Garden was negligent in allowing the birds to become exposed to psittacosis. This allegation supports a *potential* for recovery independent of the fraud and misrepresentation claims, because any damages resulting from the alleged negligence of Central Garden do not turn on whether it misrepresented the condition of the birds. Accordingly, the mere fact the *Perfect Birds* lawsuit included fraud allegations does not rule out the potential for coverage under the policy.

### 4. *"Property damage"*

The Liberty Mutual policy defines "property damage" as either "[p]hysical injury to property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." Liberty Mutual contends the *Perfect Birds* lawsuit involved economic losses and not "property damage" as that term is defined in the policy. We disagree.

Central Garden contends that Perfect Birds made two distinct types of damage claims against it: "(1) damage to birds caused by physical injury (those birds testing positive for exposure to psittacosis) and the loss of the use of those birds (PetSmart's decision to stop selling them and the State of Florida's quarantine), and (2) loss of use of birds that were not physically injured (*i.e.,* birds that did not test positive for exposure to psittacosis), but which PetSmart would not purchase and remained quarantined, and loss of use of facilities and equipment to accommodate the birds that could not be resold."

It is undisputed that the inventory of birds constitutes property. Liberty Mutual also does not seriously dispute that the exposure to psittacosis amounted to "physical

12

injury" to that property. Indeed, Liberty Mutual effectively conceded the point in its communications with Central Garden when it took the position that "the only physical injury is to your tangible property (the birds)." Consequently, the *Perfect Birds* lawsuit alleged "property damage" within the meaning of the Liberty Mutual policy. It is unnecessary for us to consider whether Central Garden suffered property damage as a result of a "loss of use" of either the birds or the facilities used to house them in order to reach this conclusion.

Liberty Mutual contends the damages in the *Perfect Birds* lawsuit resulted from the inability to sell an inventory of birds and not from property damage. According to Liberty Mutual, economic losses resulting from the inability to sell birds are not covered under a commercial general liability policy. While we agree that purely economic losses do not constitute damage or injury to tangible property (see *Giddings v. Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 219), coverage is not precluded simply because the extent of the property damage can be expressed as an economic loss. (See *Anthem Electronics, Inc. v. Pacific Employers Insurance Co.* (9th Cir. 2002) 302 F.3d 1049, 1057.) In any event, Perfect Birds alleged physical injury to the birds themselves and not just damage resulting from the inability to sell the birds.

Liberty Mutual also relies on cases establishing that lawsuits involving alleged concealment or misrepresentation in connection with a sales transaction give rise to economic losses that do not qualify as "property damage," even if damaged property is involved in the transaction. (See, e.g., *Miller v. Western General Agency, Inc., supra,* 41 Cal.App.4th at p. 1151 [no duty to defend where insured was sued for failing to disclose defective plumbing]; *Devin v. United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1158-1159 [misrepresentation concerning condition of property causes pecuniary loss and not injury to tangible property].) These cases are inapposite. The rationale underlying these cases is that "damages for fraud are ordinarily limited to recovery of economic injuries [citation], which courts have repeatedly held are not injuries to *tangible* property within the scope of coverage of a liability policy." (*Devin, supra,* 6 Cal.App.4th at pp. 1158-1159.) As discussed above, the *Perfect Birds* lawsuit included

13

more than just a fraud claim.  Perfect Birds did not just allege that Central Garden misrepresented the condition of the birds, but it also alleged that Central Garden negligently caused the birds to be exposed to psittacosis.  Thus, there was at least a potential that damages would not be limited to economic losses resulting from fraud but could also include damages for physical injury to the birds themselves.

**5.     *"Your product" exclusion***

If the "claim does fall within the insuring clause, the next question is whether any exclusion applies.  A conspicuous, unambiguous applicable exclusion will override the insuring clause and eliminate coverage the policy might otherwise afford.  [Citation.] [¶] Insuring clauses and exclusions fulfill different functions [citation] and entail different burdens of proof.  The party claiming coverage has the burden to show a claim falls within the scope of basic coverage; the insurer has the burden of showing a claim falls within an exclusion." (*American Star Ins. Co. v. Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1325.)

The Liberty Mutual insurance policy excludes coverage for " 'property damage' to 'your product' arising out of it or any part of it."  "Your product" is defined in relevant part to include "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured.  Liberty Mutual has consistently taken the position that the "your product" exclusion precludes any potential for coverage in the *Perfect Birds* lawsuit.  We agree with Liberty Mutual.

A leading insurance law treatise describes the standard "your product" exclusion as barring "coverage for physical injury to or loss of use of *whatever goods or products the insured manufactures or sells.  It is a business risk exclusion* predicated on the notion that insurers are not warrantors of their insured's products." (2 Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 7.2367, p. 7J-26 (rev. #1 2012).)  In general, the exclusion precludes coverage for property damage to the insured's own goods or products but does not apply when the insured's goods or products cause damage to *other* property.  (See *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 111-112.)

14

Here, the claimed property damage to the bird inventory falls within the scope of the "your product" exclusion. The birds were "goods or products" that were "sold" or "disposed of" by Central Garden. The property damage alleged in the *Perfect Birds* lawsuit was limited to the inventory of birds sold by Central Garden to Perfect Birds. Indeed, during the course of the parties' communications following Central Garden's tender of defense, Liberty Mutual confirmed that no birds other than those in the bird inventory purchased from Central Garden were the subject of property damage allegedly incurred by Perfect Birds. Further, the physical injury to, or loss of use of, the birds arose out of the birds themselves in that they were allegedly exposed to psittacosis before the asset sale was finalized. Under these conditions, extending coverage for property damage to the bird inventory would effectively make Liberty Mutual the warrantor of the birds Central Garden sold to Perfect Birds.

Central Garden disputes the applicability of the "your product" exclusion, arguing first that the property damage to the birds did not "arise out of the" birds but was allegedly caused by something external to them—i.e., exposure to psittacosis. As an initial matter, we disagree with Central Garden's characterization of psittacosis as something that did not arise out of the birds purchased from Central Garden. The gravamen of the *Perfect Birds* lawsuit was that Central Garden sold birds that had been exposed to psittacosis. The bacterium that causes psittacosis was part and parcel of the "product" that Perfect Birds purchased. It was not something "external" to the birds.

Further, the phrase "arising out of" has been interpreted to have " 'much broader significance than "caused by". [The words] are ordinarily understood to mean " ' "originating from" "having its origin in," "growing out of" or "flowing from" ' " or in short, "incident to, or having connection with" . . . .' " (*Continental Cas. Co. v. City of Richmond* (9th Cir. 1985) 763 F.2d 1076, 1080; accord, *Davis v. Farmers Ins. Group* (2005) 134 Cal.App.4th 100, 107.) Although we strictly construe policy exclusions against the insurer, we interpret the exclusions according to their plain meaning and will not engage in a " 'strained construction.' " (*Davis v. Farmers Ins. Group, supra,* at p. 107.) Nor will we "strain to create an ambiguity where none exists."

15

(*Waller, supra,* 11 Cal.4th at pp. 18-19.) Applying the phrase "arising out of" as it has been interpreted by California courts, it is clear that the physical injury to the birds and the loss of use of the birds grew out of or flowed from the birds themselves, which were alleged to have been exposed to psittacosis before the asset sale.

Central Garden argues that the "your product" exclusion does not apply to the "loss of use" of birds that did not test positive for psittacosis, because any inability to sell those birds did not arise out of the birds themselves. We disagree. As an initial matter, the inability to sell an inventory of personal property for some period of time gives rise to economic damages and not "loss of use" of that property. (See *Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1156 [failure to provide car dealer with lot to sell vehicles caused economic damages, not "loss of use" of vehicle inventory that could not be sold].) At oral argument in this appeal, counsel for Central Garden argued that the "your product" exclusion refers to the term "product" in the singular. According to counsel, the product in this case is a bird, not an inventory of birds. Thus, counsel argued the inability to sell a particular bird that was not exposed to psittacosis—i.e., the purported loss of use of that bird—did not arise out of the healthy bird itself. There are a number of problems with Central Garden's argument. First, "your product" is defined in the policy as the plural "goods or products," not as *a* good or *a* product. The "product" Perfect Birds purchased from Central Garden was an inventory of birds, not just a single bird. Second, the inability to sell a particular bird resulted from the concern that the entire bird inventory had been exposed to disease. The "loss of use" as to any particular bird arose from the *potential* exposure of that bird to disease, whether or not it actually had been exposed to psittacosis. Thus, the inability to sell a particular bird arose from the bird itself.

As further support for its position, Central Garden contends the exclusion does not apply to "property damage" to the facilities in which the birds were housed. The "property damage" claimed by Central Garden is the purported "loss of use" of such facilities during the period of the quarantine. We disagree with the proposition there was any covered "loss of use" of the facilities within the meaning of the Liberty Mutual

16

policy. A "loss of use" implies that the property cannot be used for its intended purpose. (See *Hendrickson v. Zurich American Ins. Co. of Illinois* (1999) 72 Cal.App.4th 1084, 1091-1091 [strawberry growers lost use of land planted with defective plants because they suffered loss of strawberry production]; *Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 818 [loss of use damages exist when plaintiff is deprived of the use of the property].) The facilities were, in fact, used for the purpose for which they were designed during the period of the quarantine—to house birds. Any damage suffered by Perfect Birds resulted from its inability to sell birds, not from an inability to use the facilities to house birds.[2]

Central Garden also disputes whether animals are "products" within the meaning of the "your product" exclusion, citing out-of-state cases holding that live animals are not "products" for purposes of strict products liability in tort. (See *Malicki v. Koci* (1997) 121 Ohio App.3d 723, 726-727 [700 N.E.2d 913]; *Latham v. Wal-Mart Stores, Inc.* (Mo.App. E.D. 1991) 818 S.W.2d 673, 676 (*Latham*).) These cases have no bearing on the contractual interpretation of the "your product" exclusion. As the *Latham* court observed, there is a split of authority in the out-of-state cases on whether live animals are products. (*Latham, supra,* 818 S.W.2d at pp. 675-676.) More importantly, the contractual language of the exclusion is not limited to "products" as that term might be applied in the strict liability context, but instead refers broadly to all "goods or products" other than real property. Above all, California courts do not interpret or effectively rewrite insurance policies to satisfy public policy concerns. (See *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1077-1078.) As our Supreme Court has succinctly explained, the determination of whether an insurance contract affords coverage "is to be found solely in the language of the [policy], not in public policy considerations." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 818.) There is no reason here to

---

[2] The cost of storing defective products is more appropriately characterized as an economic loss rather than a "loss of use" of the storage space. (See *Sokol and Co. v. Atlantic Mut. Ins. Co.* (7th Cir. 2005) 430 F.3d 417, 422 [no "loss of use" caused by defective peanut butter packets even though purchaser incurred costs to store defective product].)

look outside the policy (or to impose public policy considerations from other states' tort laws) in order to interpret the "your product" exclusion.

Finally, Central Garden contends the claimed property damage in the *Perfect Birds* lawsuit includes birds supplied to Perfect Birds by parties other than Central Garden. Thus, according to Central Garden, the "your product" exclusion is inapplicable because the *Perfect Birds* lawsuit involved property damage to property other than birds sold by Central Garden. In support of its contention, Central Garden submitted to the trial court a five-page excerpt from a transcript of a deposition of Jack Graham, the owner of Perfect Birds and its sister company, Rainbow Exotics. The import of the excerpt, as best we can tell, is that Jack Graham took in or purchased additional birds between the time of the asset purchase from Central Garden and the quarantine imposed by PetSmart. Based upon the limited portion of the deposition transcript provided to the court, it is unclear whether any additional birds belonged to Perfect Birds or Rainbow Exotics.

Regardless of what the Jack Graham deposition excerpt may reveal or suggest, Central Garden's reliance on the deposition excerpt is untimely. According to Liberty Mutual, the transcript was not made available to Liberty Mutual until September 2, 2010, two years after the *Perfect Birds* lawsuit was first tendered to Liberty Mutual and 12 months after the case was settled. Central Garden does not dispute that Liberty Mutual was unaware of the transcript until September 2010 but claims the fault for the nondisclosure lies with Liberty Mutual. According to Central Garden, Liberty Mutual would have learned of the deposition earlier if it honored its duty to participate in the defense.

"[A]n insurer does not have a continuing duty to investigate whether there is a potential for coverage. If it has made an informed decision on the basis of the third party complaint and the extrinsic facts *known* to it at the time of tender that there is no potential for coverage, the insurer may refuse to defend the lawsuit." (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1114.) An insurer's "duty to defend is not measured by hindsight . . . ." (*We Do Graphics, Inc. v. Mercury Casualty Co.* (2004) 124 Cal.App.4th 131, 136.) Here, Liberty Mutual made an informed decision based upon the

information known to it at the time of tender that there was no potential for coverage. This determination was reached after Liberty Mutual investigated whether the claimed damages in the *Perfect Birds* lawsuit involved birds other than those supplied to Perfect Birds by Central Garden. For reasons we have explained, Liberty Mutual was justified in denying a duty to defend at the time of tender based upon the applicability of the "your product" exclusion. Under the circumstances, Liberty Mutual did not have a continuing duty to investigate the potential for coverage. (*Gunderson v. Fire Ins. Exchange, supra,* 37 Cal.App.4th at p. 1114.)

Central Garden could have provided Liberty Mutual with the Graham deposition transcript before the *Perfect Birds* lawsuit settled. It did not do so. In the absence of a new tender of defense, Liberty Mutual had no way to know of the information contained in the transcript and no obligation to seek out the transcript itself. (See *Gunderson v. Fire Ins. Exchange, supra,* 37 Cal.App.4th at p. 1117.) We conclude the belatedly provided deposition transcript is irrelevant to our determination of whether Liberty Mutual had a duty to defend Central Garden.[3]

## DISPOSITION

The judgment is affirmed. Liberty Mutual shall be entitled to recover its costs on appeal.

---

[3] Because the duty to defend is broader than the duty to indemnify, our conclusion that Liberty Mutual did not have a duty to defend is dispositive of Central Garden's claim that Liberty Mutual had a duty to indemnify. (See *Delgado, supra,* 47 Cal.4th at p. 308, fn. 1.)

19

_____
McGuiness, P. J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.